Matthew J. **CONNELLY** and **T. Lamar Caudle, Appellants,**

v.

**UNITED STATES of America,** Appellee.

No. 15746.

United States Court of Appeals Eighth Circuit.

Nov. 15, 1957.

Rehearing Denied Dec. 13, 1957.

**578**

John H. Lashly and Jacob. M. Lashly, St. Louis, Mo. (Paul B. Rava, Lashly, Lashly & Miller, St. Louis, Mo., and Alan Y. Cole, Washington, D. C., were with them on the brief), for appellant Matthew J. Connelly.

John J. Hooker, Nashville, Tenn. (Walter M. Haynes, Winchester, Tenn., and C. Arthur Anderson, St. Louis, Mo., were with him on the brief), for appellant T. Lamar Caudle.

Warren Olney, III, Asst. Atty. Gen. (Harry Richards, U. S. Atty., St. Louis, Mo., and Carl H. Imlay, Atty., Dept. of Justice, Washington, D. C., were with him on the brief), for appellee.

Before GARDNER, Chief Judge, and VOGEL and VAN OOSTERHOUT, Circuit Judges.

GARDNER, Chief Judge.

Appellants with one Harry I. Schwimmer were indicted under an indictment which charged them with conspiring to defraud the United States government in violation of Section 371, Title 18, U.S.C. The single count indictment alleged that the purpose of the conspiracy was to defraud the United States of the proper administration of the Internal Revenue laws and regulations, of the proper and faithful service of appellants Connelly and Caudle and to commit the offenses of bribery, perjury and knowingly making false statements and entries. The indict-

ment named as co-conspirators but not as defendants Irving Sachs, Ellis N. Slack, Shu-Stiles, Inc., and divers other persons to the grand jury unknown. At all times pertinent to the issues here involved appellant Matthew J. Connelly was Appointment Secretary to President Truman; appellant T. Lamar Caudle was an Assistant Attorney General in charge of the Tax Division of the Department of Justice; Harry I. Schwimmer was a Kansas City, Missouri, lawyer; Ellis N. Slack was an attorney in the Department of Justice; Irving Sachs was a St. Louis, Missouri, shoe broker, and Shu-Stiles, Inc. was a Missouri corporation of which Sachs was president. The indictment further charged that the purpose of the conspiracy was to protect Irving Sachs from criminal prosecution for Internal Revenue law violations.

After considerable testimony had been introduced by the government in support of the indictment Harry I. Schwimmer, named as a defendant, suffered a heart attack making it impossible for him to be present at the trial and thereupon a five day continuance was had. On proof that defendant Schwimmer could not, because of his heart condition, continue to be present at the trial or to participate therein the court declared a mistrial as to him whereupon appellants Connelly and Caudle moved for a mistrial as to themselves, which motions the court denied. At the close of the government's evidence in chief, appellants moved for judgments of acquittal which motions were denied. The appellants then offered evidence in their defense and at the close of all the evidence they renewed their motions for judgments of acquittal. The court announced that it would reserve ruling on these motions. At the close of all the evidence the court withdrew from the consideration of the jury the allegations of the indictment regarding the substantive offenses of bribery, perjury and knowingly making false statements and entries and then submitted the case to the jury on instructions to which no exceptions are here urged. The jury returned verdict of guilty as charged in the

indictment and thereafter appellants interposed motions for judgment of acquittal notwithstanding the verdict, or, in the alternative, for a new trial. They also renewed their motions for mistrial which had been denied at the time a mistrial was declared as to defendant Schwimmer. The court set these motions down for hearing thirty days from the date of filing. Twelve days before the date set for hearing Judge Hulen, who had heard the case, departed this life and thereafter and in due course Judge Gunnar H. Nordbye, United States District Judge for the District of Minnesota, was appointed as successor judge under Rule 25, Federal Rules of Criminal Procedure, 18 U.S.C.A. Subsequent to the appointment of Judge Nordbye as successor judge appellants filed a supplemental motion for new trial on the ground of newly intervening facts, namely, the death of Judge Hulen, whereby appellants alleged they were deprived of the determination of pending motions by the trial judge, and on the ground of newly discovered evidence regarding the failure of some jurors to answer material questions propounded by the trial court upon voir dire examination. A hearing was had before Judge Nordbye on all pending motions December 18, 1956, and thereafter on February 11, 1957, all pending motions were overruled by him. Subsequent to the denial of these pending motions and on or about March 4, 1957, appellants filed a third supplemental motion for new trial on the ground of alleged newly discovered evidence. This too was denied by Judge Nordbye, following which the court pronounced sentence and entered judgment pursuant to the jury's verdict.

■ It is the contention of appellants that they were deprived of a fair trial by virtue of Judge Hulen's death after verdict was rendered and by the fact that a successor judge heard and denied their post-trial motions for judgment of acquittal and for a new trial. It is urged that the successor judge was not qualified to pass upon the pending motions, particularly their motions for judgment of acquittal notwithstanding the verdict or

in the alternative for a new trial, because not having presided at the trial of the case he did not have the "feel of the case". Rule 25, Federal Rules of Criminal Procedure provides as follows:

"If by reason of absence from the district, death, sickness or other disability the judge before whom the defendant has been tried is unable to perform the duties to be performed by the court after a verdict or finding of guilt, any other judge regularly sitting in or assigned to the court may perform those duties; but if such other judge is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial."

Judge Nordbye was assigned as successor judge in this case in strict compliance with this rule. Federal criminal law and procedure are dependent upon Federal statutes. Under this rule it was the duty of the successor judge, in the first instance at least in the exercise of a sound judicial discretion, to determine whether he could satisfactorily perform the duties of the judge who presided at the trial and whom he succeeded. It is to be observed that in the instant case while Judge Nordbye was assigned to perform the unfinished trial of this case on June 16, 1956, he did not hear the pending motions until some six months later and it is quite apparent from this record that in that time he thoroughly familiarized himself with the facts and satisfied himself that he could perform the duties to be performed by the presiding judge. Referring to this contention Judge Nordbye in the course of his opinion says:

" * * * This Court is not unmindful that the observation made by the defendants as to the assigned Judge's being unable to have the 'feel of the case' is a matter that deserves careful consideration, and undoubtedly there is substance to defendants' position in this regard. On the other hand, this Court cannot escape the fact that this case has

taken a long time to try, the defendants were represented by experienced and skillful counsel, and the Judge who presided at the trial was recognized by all parties to have been not only an able and experienced trial judge, but one who presided with impeccable fairness and impartiality. Consequently, it would seem that, under these circumstances and after consideration of the entire record, I should not evade the responsibility which rests upon me by summarily granting a new trial, but rather to the best of my ability attempt to render definitive rulings on the various aspects of the motions presented."

■■ There might well be a criminal case in which the testimony would be of such a character that a successor judge could not fairly pass upon the questions here presented. If the evidence of the government were denied and the question of the credibility of the government witnesses was a serious issue the conflict in the evidence and the question of the credibility of witnesses might be a matter of very serious consideration. However, in the instant case the evidence of the government was not of that character. As has been observed, the defendants here were charged with attempting to thwart the criminal prosecution of Irving Sachs for Internal Revenue law violations. The Internal Revenue agents on investigation reported that Sachs as president of Shu-Stiles, Inc. had fraudulently evaded taxes due the government by the company to the extent of $188,-378.32. Criminal prosecution had been recommended by the agents of the Bureau of Internal Revenue and attorney Schwimmer was then employed to thwart this threatened criminal prosecution. The government's testimony tended to prove certain business transactions between Schwimmer and appellants by which the appellants profited, the payment of large sums of money by Sachs to Schwimmer, entries in books of Schwimmer indicating disbursement of sums of money on behalf of appellants, evidence that Schwimmer had purchased for appellant Connelly two suits of clothes, and evidence of visits by Schwimmer to and consultations with the appellants at various times. This general characterization of this testimony indicates that it was in the nature of circumstantial evidence by the government furnishing the basis for inferences by the jury and it was not disputed by appellants but their testimony went to either their lack of knowledge of other explanations of the transactions proven by the government. In these circumstances there was not much to be gained by hearing the testimony of the witnesses and observing their demeanor that could not be gained by reading the testimony and we think Judge Nordbye did not abuse his judicial discretion when he determined, as he manifestly did, that he could perform the duties to be performed by the presiding judge after verdict. The law governing the situation here presented was strictly complied with and we think that law provided due process within the requirements of the Fifth Amendment. Meldrum v. United States, 9 Cir., 151 F. 177; Chin Wah v. United States, 2 Cir., 13 F.2d 530; King v. United States, 6 Cir., 25 F.2d 242; Owens v. Hunter, 10 Cir., 169 F.2d 971; McIntyre v. Modern Woodmen of America, 6 Cir., 200 F. 1; Pessagno v. Euclid Inv. Co., D.C.D.C., 35 F.Supp. 743; United States v. Green, D.C.S.D.Ill., 143 F.Supp. 442. In Meldrum v. United States, supra, the authority of a succeeding judge to pass upon a motion for a new trial in a federal criminal case tried before another judge who died while the motion was pending was expressly sustained. In the course of the opinion in that case it is said [151 F. 182]:

"Did the judge of the court below have authority to pass upon the motion for a new trial and impose the sentence? The plaintiff in error contends that he did not, that he had not participated in the trial, and that the right of the plaintiff in error to have the judge who presided at his trial take part with the jury at every

step in the determination of his guilt or innocence was a fundamental right which could not be taken away by an act of Congress, * * *.

"* * * Section 953 of the Revised Statutes as amended by Act June 5, 1900, c. 717, § 1, 31 Stat. 270 (U.S.Comp.St.1901, p. 696 [Fed. Rules Civ.Proc. rules 46, 63, 75, 28 U.S.C.A.]), provides that in case of the death of the judge before whom a cause has been tried the judge who succeeds him 'or any other judge of the court in which the cause was tried, holding such court thereafter, if the evidence in such case has been or is taken in stenographic notes * * * shall pass upon said motion and sign such bill of exceptions'; and it further provides that if said judge is satisfied that, owing to the fact that he did not preside at the trial or for any other cause, he cannot fairly pass upon said motion and allow and sign said bill of exceptions, he may in his discretion grant a new trial. If the succeeding judge can, as undoubtedly he may under this statute, deny a motion for a new trial, there can be no question of his power to further proceed in the case and render judgment upon the verdict."

We conclude that the contention that Judge Nordbye was disqualified to perform the duties to be performed by the presiding judge after verdict is without merit.

█ Appellants were subpoenaed as witnesses to testify before the grand jury and each of them did so testify. After the return of the indictment they moved to dismiss the indictment and suppress the testimony which they had given before the grand jury on the ground that they had not been advised that the prosecutor had decided at the time they testified to seek an indictment against them. Appellant Caudle was a lawyer with wide experience in criminal prosecutions on behalf of the government. Appellant Connelly was a man experienced in the investigating of fraud and criminal matters. He had been the chief investigator for a Senate committee investigating many fraudulent and criminal situations. The record definitely shows that each of the defendants was apprised of his constitutional rights. There was some doubt as to when the prosecutor had definitely decided to seek an indictment against them. After hearing testimony on the motion Judge Hulen decided when the prosecutor had decided to seek indictments against them and he suppressed all testimony given by them before the grand jury after that date, but denied the motion to suppress testimony given by them before that date and also denied their motions to dismiss the indictment. The ruling of the court, we think, was eminently fair to appellants. We shall not encumber this opinion with a long recital of the warnings given and the circumstances thereof. It abundantly appears that they were advised and were at all times aware of their constitutional rights. We think the contention of appellants in this regard wholly without merit.

█ The trial of this case began May 7, 1956, and the jury returned a verdict June 14, 1956. After the case had been on trial for some sixteen days the defendant Schwimmer suffered a heart attack and as hereinbefore noted a mistrial was declared as to him. Thereupon appellants moved for a mistrial as to themselves on the ground that certain evidence admitted as to Schwimmer alone was of such a prejudicial nature that its effects could not be eradicated from the jury's mind by the court's instructions. Their motion was denied and the court instructed the jury that the testimony which the court identified, admitted as to Schwimmer alone, was withdrawn from the jury's consideration. In the course of its instruction on this question the court said:

"Now, as to the testimony given by these two witnesses as I have referred to them as to these conversations with Schwimmer, I withdraw that testimony from your consideration. I have not gone into it in de-

582

tail, but you will recall it. You are not to consider such testimony as evidence in this case of any character. Just forget that that testimony relating to the subject and at the times I have referred to was given in this case. Strike it from your minds entirely. It now has no bearing on the issues in this case and you will not consider it in any manner in arriving at your decision as to the guilt or innocence of either of the defendants in this case.

"Does that cover the subject?"

The instruction was not excepted to. The testimony in no way implicated either of the other defendants on trial and we think the court's instruction proper, and we cannot presume that the jury disregarded it. Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154; Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593; Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101; Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.E.2d 278. In Blumenthal v. United States, supra, two of the defendants had made admissions which the trial court admitted as to them only and in its instructions specifically limited such evidence as to them and told the jury to disregard such evidence in considering the guilt or innocence of the other three defendants. In the course of the opinion it is among other things said [332 U.S. 539, 68 S.Ct. 253]:

"But the trial court's rulings, both upon admissibility and in the instructions, leave no room for doubt that the admissions were adequately excluded, insofar as this could be done in a joint trial, from consideration on the question of their guilt. The rulings told the jury plainly to disregard the admissions entirely, in every phase of the case, in determining that question. The direction was a total exclusion, not simply a partial one as the Government's argument seems to imply. The court might have been more emphatic. But we cannot say its unambiguous

direction was inadequate. Nor can we assume that the jury misunderstood or disobeyed it."

In the very recent case of Delli Paoli v. United States, supra, the Supreme Court, reaffirming the doctrine of its prior decisions, said [352 U.S. 232, 77 S.Ct. 300]:

"It is a basic premise of our jury system that the court states the law to the jury and that the jury applies that law to the facts as the jury finds them. Unless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense. Based on faith that the jury will endeavor to follow the court's instructions, our system of jury trial has produced one of the most valuable and practical mechanisms in human experience for dispensing substantial justice."

■ The declaration of a mistrial as to the defendant Schwimmer removed him from the case and it is to be noted that prior to the trial appellants sought to remove him from the case by a motion for severance. This declaration of a mistrial as to Schwimmer as effectively removed him from the case as would the granting of appellants' motions for severance. But it seems to be argued that appellants were prejudiced, both by having Schwimmer tried jointly with them and by removing him by process of declaring a mistrial as to him. It is suggested that when Schwimmer was removed as a defendant they were deprived of his possible testimony on the assumption that he would have taken the stand in his own defense. This he might or might not have done and in this connection it is observed that he invoked the Fifth Amendment when he was called before the grand jury. Neither is there any assurance that had he taken the witness stand his testimony would have any tendency to exonerate appellants. Appellants' position after the severance of Schwimmer

by the court's declaration of a mistrial as to him was no different than it would have been had he been named only as a co-conspirator. Even had Schwimmer been named as a co-conspirator only, his acts and declarations during the time of and in furtherance of the conspiracy would have been admissible against appellants. We think the removal of Schwimmer from the case was not prejudicial to appellants. Carrado v. United States, 93 U.S.App.D.C. 183, 210 F.2d 712; Poliafico v. United States, 6 Cir., 237 F.2d 97; United States v. Beck, 7 Cir., 118 F.2d 178; United States v. Karavias, 7 Cir., 170 F.2d 968. The motion for mistrial as to the appellants because of the severance of Schwimmer by the court's declaration of mistrial as to him was under the circumstances here disclosed addressed to the sound judicial discretion of the trial judge and we think this discretion was wisely exercised in denying appellants' motions.

■ The court on its own motion entered an order directing that in selecting jurors for this case residents of the city and county of St. Louis be excluded from the list of prospective jurors, and the prospective jurors were accordingly selected from other parts of the district. Prior to the entry of this order the defendants had moved for a change of venue on the ground, among others, that they could not have a fair and impartial trial in the district because of the prejudicial publicity, editorial and otherwise, largely contained in the daily newspapers published in St. Louis and widely circulated and read, concerning alleged corruption of public officials in the Bureau of Internal Revenue and in the Department of Justice, and specifically relating to the method of handling income tax evasion cases in the Eastern District of Missouri, and the alleged corruption of public officials both in the District of Columbia and the Eastern District of Missouri. These motions were denied but the court then entered the above order, geographically excluding residents of the city and county of St. Louis. Section 1865(a), Title 28, U.S.C. provides:

"Grand and petit jurors shall from time to time be selected from such parts of the district as the court directs so as to be most favorable to an impartial trial, and not to incur unnecessary expense or unduly burden the citizens of any part of the district with jury service. * * * "

The order was in strict conformity with the statute and it did not eliminate any particular class but the jury as drawn represented a cross section of the geographic unit designated and was manifestly selected from that part of the district which the judge thought to be most favorable to an impartial trial. The contention that the order resulted in a "rural" jury is without foundation in fact. As disclosed by their examination on voir dire for instance, six of the panel had lived in St. Louis or other large cities for some time. Many of the other jurors lived in large towns. Neither were the prospective jurors exclusively engaged in agricultural pursuits but included a wide range of professions, trades and occupations. The action of the trial judge followed a practice warranted by this statute. Myers v. United States, 8 Cir., 15 F.2d 977; Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181; Frazier v. United States, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187. In Myers v. United States, supra [15 F.2d 978], it is said:

"Plaintiff in error, defendant below, filed a motion to quash the jury panel because of the exclusion, in the drawing, of jurors from Douglas county, in which Omaha is situated; it being urged that the population of Douglas county formed a large percentage of that of the division of the district in which the offense was committed and tried. The order excluding these jurors was made pursuant to a long-standing practice of the court that, in drawing jurors, the county in which the crime was committed should be excluded.

* * * * * *

"The motion to quash the panel was properly overruled. The law au-

thorizes the court to draw the jury as was done in this case, and it is not required to assign a reason for so doing. The presumption is that it acted in the exercise of a sound discretion. If requested to assign a reason for the purpose of making a record for review, we think proper practice would require this to be done; but, in the absence of such request, we do not think the discretion can be challenged on that ground. The burden is upon the party who seeks to challenge the alleged arbitrary action, and in this case that burden has not been successfully carried. Spencer v. United States, 8 Cir., 169 F. 562, 95 C.C.A. 60."

We must presume that it was the purpose of the trial judge to have the jury selected from such parts of the district as to be most favorable to an impartial trial.

■ After the trial had closed and the jury had returned a verdict finding appellants guilty, and a successor judge had been assigned to finish the trial of the case, appellants filed a motion for new trial on the ground of newly discovered evidence. In this motion it was alleged that two of the women jurors had concealed important facts relevant to their personal qualifications thereby impairing appellants' rights to intelligently exercise their challenges and depriving them of a fair and impartial trial. These two jurors were women. On voir dire the judge propounded among others the following questions:

"Have any of you or the immediate members of your family, mother, father, brother, sister or husband or wife, or children, other than the gentleman who was sheriff, have you or any immediate members taken part in behalf of either political parties in political affairs such as a candidate for office or committee worker?

"Do either of you or are any members of your family affiliated or hold membership or office—we have covered county committees, but some-times there are Democratic or Republican organizations separate from the committee, and sometimes Democratic clubs or Republican clubs. To your knowledge, are you or any member of your family any members of such club or organizations? if so, raise your hand."

Neither of these women jurors answered either of these inquiries in the affirmative. In referring to this incident Judge Nordbye in his opinion says:

"The evidence at the hearing on the motions for a new trial, which supplanted the affidavits previously obtained, indicate that these two jurors, to wit, Goldie Brown and Grace Hoffman, were members of the Montgomery Township Republican Club in the years 1953, 1954 and 1955, but evidently from the testimony it would appear that they were not in 1956. Robert Hoffman, however, the son of Grace Hoffman, was treasurer of the committee or club in 1956. There is no showing here that Mrs. Hoffman knew that her son was treasurer of the local Republican Central Committee in 1956, and moreover, there is no showing that either of these jurors wilfully failed to answer truthfully the questions to which reference has been made. Furthermore, there is no showing that the defendants were prejudiced in any way by reason of any Republican affiliation or activities of either of these two jurors. This Court has no right to assume that in this trial jurors of Republican political affiliation would be prejudicial to these defendants and that jurors of Democratic affiliation would be prejudicial to the Government. And finally, the record is bereft of any showing that there was fraudulent conduct on the part of these jurors."

We are in entire accord with this ruling.

■ It is contended that the court erred in denying a change of venue or a continuance. The motions were address-

ed to the discretion of the court, Finnegan v. United States, 8 Cir., 204 F.2d 105; Stroud v. United States, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103, and on careful review of the record we are convinced that there was no abuse of that discretion.

 It is next contended that appellants' motion for judgment of acquittal or a new trial should have been granted because the evidence is as consistent with innocence as with guilt. In considering the question of the sufficiency of the evidence to go to the jury and to sustain the verdict we must view the evidence in a light most favorable to the prevailing party, in this case the government, and the prevailing party is entitled to all such favorable inferences as may reasonably be drawn from the facts and circumstances proven. If when so viewed, reasonable minds might reach different conclusions then the issue is one of fact to be submitted to the jury and not one of law to be determined by the court. Brennan v. United States, 8 Cir., 240 F.2d 253; Peters v. United States, 8 Cir., 160 F.2d 319.

 It appears without dispute that Irving Sachs was guilty of a wilfull and flagrant tax fraud to which there was apparently no defense. As heretofore noted the agents of the Bureau of Internal Revenue had recommended prosecution. In this situation Harry I. Schwimmer, a lawyer of Kansas City, Missouri, was employed for the express purpose of thwarting this threatened criminal prosecution. His first ground for seeking relief was that Sachs had made voluntary disclosure. When it was shown that the so-called disclosure was not full and complete but was itself fraudulent Schwimmer abandoned that theory and sought to protect his client from criminal prosecution on the ground of ill health, claiming that his prosecution would probably result in his death. While it was shown that Sachs was an epileptic, the fact was not known to his own counsel, Shifrin, who had represented him for some twenty years, and even during the time the Department of Jus-

tice was considering the gravity of his malady he was able to look after his business in substantially his usual and normal manner. He was chief executive of Shu-Stiles, Inc., a substantial concern. At the government's request he was examined by Dr. Robert M. Bell, a consultant for the United States Public Health Service in neuropsychiatry. Dr. Bell reported that in his opinion any fatal outcome in the case of prosecution and trial of Sachs was "remote indeed". Schwimmer employed a number of doctors, none of whom made an examination of Sachs, but on the basis of reports and data submitted to them gave as their opinion that criminal prosecution of Sachs would constitute a clear and present danger to his health. Caudle disregarded the report of Dr. Bell; he also disregarded the recommendation of the Bureau of Internal Revenue and ordered that Sachs be not criminally prosecuted but that the case be treated on the basis of civil liability. His action in disregarding the recommendation of the Bureau of Internal Revenue and in disregarding the report of a government doctor was unprecedented and did violence to the accepted practice of the Department. It appears from the evidence that Schwimmer made frequent calls on Caudle and Connelly. There is evidence of their frequent conversations and there is evidence of Caudle's and Connelly's continued activity and interest on behalf of Schwimmer's client. Schwimmer received in payment as compensation for his services in seeking to thwart the criminal prosecution of Sachs some $46,000, from which apparently he paid to each of the appellants or on their behalf substantial sums of money. There is also undisputed evidence that Schwimmer presented to Connelly two suits of clothes made to order.

As has heretofore been noted, the appellants, through Schwimmer, had certain business transactions in which they made substantial profits. The jury may well have inferred that these so-called business transactions were a mere cover-up for the fact that Schwimmer was

## 586

compensating them for assisting him in thwarting the prosecution of a man confessedly guilty of defrauding the government. It is strenuously urged that the evidence was insufficient to prove that Connelly knowingly participated as a co-conspirator. It appears from the evidence that Connelly first called Charles Oliphant, Chief Counsel of the Bureau of Internal Revenue, in August of 1948, when Schwimmer had scheduled a conference with Oliphant, saying that Schwimmer had asked that "we call you and let you know we know him".

The case was referred to the Department of Justice August 12, 1949, after pending about four years in the Bureau of Internal Revenue where Schwimmer, with the assistance of Connelly, had secured its delay. Subsequent to the transfer of the case to the Department of Justice Schwimmer obtained a further delay of one month. In September of 1949 Connelly then called Caudle and requested further postponement for his "friend" Harry I. Schwimmer. In response to this request Caudle relayed a message through Connelly to Schwimmer that Schwimmer could come in whenever he wanted but as soon as possible and that a postponement would be all right because the statute of limitations was not involved. A few days subsequent to this contact between Connelly and Caudle, Sachs paid $2,500 from Shu-Stiles, Inc. money to Schwimmer and on October 12, 1949, gave Schwimmer a check for $10,000, from which Schwimmer purchased an oil royalty for Connelly. The jury was warranted in believing that these expenditures by Schwimmer on behalf of Connelly were to reward him for his services in assisting to thwart the criminal prosecution of his client Sachs and there are other attending circumstances corroborating this conclusion. As pointed out by Judge Nordbye:

"That Connelly knew and understood that Schwimmer's business with Caudle was an attempt to obtain a commitment from the Department of Justice that there would be no criminal prosecution in the Sachs case, seems evident from the conversation which Connelly had with Oliphant over the telephone on January 16, 1951. At that time Schwimmer already had obtained a letter from Caudle stating that there would be no criminal prosecution in the Sachs case, but notwithstanding he was attempting to obtain a similar letter of no-prosecution from the Bureau of Internal Revenue. In a conversation with Connelly over the telephone, Oliphant stated, 'You know Schwimmer on Sachs—does he just want to look good?' And Connelly replied, 'Wants to make sure not going to reverse justice again.' Certainly, this conversation would indicate that Connelly was aware of Schwimmer's plans to have both Departments committed on the Sachs case so that he need have no fear that the Bureau would render a ruling adverse to that which he obtained from the Justice Department. Moreover, it must be apparent that Connelly knew that Schwimmer had obtained a no-prosecution letter from Caudle at that time. The friendly relations between Connelly and Schwimmer and the six or seven or more telephone calls to government officials made by Connelly with reference to the Sachs case fully warranted the jury in determining that Connelly's relation with the case that was pending in the Bureau of Internal Revenue and then in the Department of Justice was something more than mere routine telephone calls for the arranging of appointments."

The inferences to be drawn from all the surrounding circumstances connecting Connelly with the activity of Schwimmer warranted the jury in returning its verdict of guilty as to both appellants.

There was in evidence a document in Schwimmer's handwriting indicating that in connection with Schwimmer's attempt to thwart the criminal prosecution of his client, Schwimmer paid substantial sums to or on behalf of appellants. These circumstances, we think,

warranted the jury in inferring that Schwimmer paid the appellants substantial sums of money for their assistance in attempting to thwart the criminal prosecution of his client. We conclude that the evidence, with the inferences that might reasonably be drawn therefrom by the jury, was substantial and that there was no error in denying appellants' motion for judgment of acquittal or for a new trial.

 It is however contended that the court erred in admitting in evidence a document referred to in the evidence as Exhibit 100(j) which we have heretofore adverted to as a document in Schwimmer's own handwriting taken by the government from one of his account books. There was ample evidence to warrant the jury in finding, as it manifestly did, that the defendants Schwimmer, Connelly and Caudle had entered into a conspiracy as charged in the indictment. Any act or admission by either of the participants in the conspiracy occurring during its existence and in furtherance of its purposes was admissible as to all defendants. Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593; Wiborg v. United States, 163 U.S. 632, 16 S.Ct. 1127, 1197, 41 L. Ed. 289; Cwach v. United States, 8 Cir., 212 F.2d 520; Braatelien v. United States, 8 Cir., 147 F.2d 888; Harper v. United States, 8 Cir., 143 F.2d 795. The exhibit contains the following:

"Oct—49
"Loan $2,500
From I. Sachs
"Shu-Stiles ................ $10,000
"Pd out Oil Royalty M. C. ... 4,200

"Held in Escrow to be paid $5,800
out depending on whether I.
Sachs case is dropped."

As said by Judge Nordbye in considering the admissibility of this exhibit:

"Government's Exhibit 100–j does not represent the entry of a mere narrative event, but it consists of an act of a conspirator who was handling the fund by and through which the conspiracy was to be accomplished. The entry consists of a recording of the receipt of the first anticipated disbursement thereof and the earmarking of the remaining funds for the purpose of carrying out the conspiracy. To earmark or allocate the remainder of a slush fund which has been created for the purpose of consummating an unlawful conspiracy would be an act in furtherance of such conspiracy."

We are in accord with Judge Nordbye's views. There was independent evidence that on October 12, 1949, co-conspirator Sachs, president of Shu-Stiles, Inc., gave Schwimmer a $10,000 check in addition to a prior payment of $2,500 on September 22, 1949, both of which are reflected in this exhibit. This testimony shows that these entries were made during the existence of the conspiracy. We think the exhibit was properly admitted as against both appellants.

 There was admitted in evidence over the objection of appellants testimony of certain telephone conversations between Schwimmer and Oliphant, Caudle and Oliphant, and Connelly and Oliphant. These were based upon transcripts made by Oliphant's secretaries in the so-called Oliphant log which was a record kept in the regular course of Oliphant's official duties by Oliphant's secretaries. The sole objection to the admission of this evidence was that it violated the best evidence rule. The evidence shows that when a call would come in to the office over the official, as opposed to the private office telephone, of the Chief Counsel for his personal attention, the secretaries would listen in with earphones and transcribe the official content only as a routine matter in the regular course of their duties. The records made recorded the calls in full unless the call concerned only the making of an appointment, in which case they just recorded that fact in its essence. Although the objection was based solely on the ground that this evidence was violative of the best evidence rule it is now argued that the entries were not kept in the regular course of business, but were private entries.

The practice of keeping these records of official calls and visits was a well established practice which had been followed not only by Mr. Oliphant but by his predecessor in office. This testimony was admissible, we think, under the Federal Business Records Act, Sec. 1733(a), Title 28, U.S.C.; Finnegan v. United States, supra; Harper v. United States, supra; Holland v. United States, 10 Cir., 209 F.2d 516; Stegemann v. Miami Beach Boat Slips, 5 Cir., 213 F.2d 561. The evidence conclusively showed that these records were made in the usual and systematic course of the business to which they had reference and they specifically referred to actions occurring at the time of their entry. We need not here enumerate the reasons for the rule making such entries admissible. They are too well established to require citation of authorities. There was no error in admitting this evidence, which incidentally directly showed Mr. Connelly's continued interest in the success of Mr. Schwimmer's undertaking to prevent the criminal prosecution of his client.

 It is finally urged that the court erred in receiving evidence on rebuttal to the effect that appellant Connelly accepted gifts of clothing from Schwimmer. The evidence so received showed that Connelly received two suits worth $315.78 and a top coat worth $110 from Schwimmer. On cross-examination Connelly was repeatedly asked whether he had received any money, property, gifts or anything of value from Schwimmer during the time of the transactions here in question. He was quite evasive but finally answered that his wife might have received some flowers and he might have received some neckties. On further inquiry the witness said that he could not "recall" any others. He was then directly asked whether he had not received two suits of clothes "of a value over $300" which he then admitted receiving but that he could not recall when he received these gifts or whether he had received anything else of value from Schwimmer. On re-examination by his counsel the witness was asked to give the dates of the presents given him. In answer to this Connelly testified that in

the past he had frequently received gifts from friends at the Christmas season. It appears from the cancelled checks produced that the gifts of two suits of clothes were given in the month of July, 1952. The government also showed that Connelly received a top coat in November or December of 1952. The testimony was admitted as to Connelly alone. We think it was clearly admissible on the question of the credibility of the witness and on the question of intent. No exception was saved by appellants to the instruction of the court so limiting this testimony. Acts done by a conspirator even after the termination of the conspiracy are properly admissible as having probative value as bearing on the intent and purpose of the conspirator in doing acts during the existence of the conspiracy. Thus in Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 489, 97 L.Ed. 593, it is said inter alia:

"It does not necessarily follow that acts and declarations made after the conspiracy ended are not admissible. In this case, the essential fact of the conspiracy was the existence of phony marriage ceremonies entered into for the sole purpose of deceiving the immigration authorities and perpetrating a fraud upon the United States. *Acts* which took place after the conspiracy ended which were relevant to show the spuriousness of the marriages and the intent of the parties in going through the marriage ceremonies were competent * * *."

 It is now well established that evidence of acts or transactions not done in furtherance of the conspiracy may nevertheless be admitted if they tend to connect the conspirator with the conspiracy "by explaining his state of mind." Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 470, 86 L.Ed. 680. Neither is there any merit to the contention that this evidence was not admissible because it was offered in rebuttal. Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503. We conclude that there was no prejudicial error in admitting this testimony. We have given consideration

to all the other contentions urged by appellants but think they are wholly without merit.

Appellants were represented at the trial of this case by skilled counsel of wide experience. The case has been well briefed on either side and ably argued. On the whole record we are convinced that the appellants had a fair trial and that there were no prejudicial errors committed by the trial court. The judgment appealed from is therefore affirmed.