Isadore **BLUMENFIELD**, Appellant,

v.

**UNITED STATES** of America,
Appellee (two cases).

Monte **PERKINS**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

Nos. 16465–16467.

United States Court of Appeals
Eighth Circuit.

Nov. 15, 1960.

**48**

Thomas D. McBride, Philadelphia, Pa., for appellants; Michael Von Moschzisker and McBride, Von Moschzisker &

Bradley, Philadelphia, Pa., and E. David Rosen, Miami, Fla., on brief, for appellant Blumenfield, and Erling Swenson, Minneapolis, Minn., on brief for appellant Monte Perkins.

Hyam Segell, Asst. U. S. Atty., St. Paul, Minn., for appellee; Fallon Kelly, U. S. Atty., St. Paul, Minn., on the brief.

Before SANBORN, WOODROUGH and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

A federal grand jury at St. Paul, Minnesota, returned four indictments against Isadore Blumenfield and Monte Perkins [1] charging them with violations of the so-called White Slave Traffic Act, Title 18, U.S.C.A. § 2422 on four separate dates, between December 24, 1955 and July 14, 1958, and one indictment charging an unlawful conspiracy. The latter, based upon Title 18, U.S.C.A. § 371, charged that between September 1, 1954, and September 1, 1958, at Minneapolis, Minnesota, and divers other places to the grand jury unknown, Blumenfield and Perkins conspired to commit certain offenses against the United States in violation of Title 18, U.S.C.A. § 2422, and that in furtherance of the conspiracy the defendants performed 13 separate overt acts, set forth explicitly in the indictment. It is sufficient to say that each of the overt acts named one Marilyn Ann Tollefson as the object of the defendants' activities.

Upon motion the cases were consolidated for trial.

Defendants were convicted on indictment No. 71,[2] which charged a substan-

1. The indictments recited that Blumenfield was "also known as 'Kid Cann,' 'Ferguson,' and 'Fergie Bloom'" and that Perkins was also known as "Monte Percansky." Although Blumenfield's aliases were stricken by the court prior to trial, he was referred to under these various names in testimony.

2. Because of the attack made thereon indictment No. 71 is here set out verbatim:
"Indictment
(Title 18 U.S.C., Sec. 2422).
"The Grand Jury Charges:
"On or about the 8th day of May, 1956, in the City of Minneapolis, County of

Hennepin, State and District of Minnesota, one

 Isadore Blumenfield,
 also known as Kid Cann,
 Ferguson, and Fergie Bloom,

did knowingly persuade, induce and entice a woman to go by common carrier, to wit, an airplane, from Chicago, Illinois to Minneapolis, Minnesota, for the purpose of prostitution, debauchery, and other immoral practices, and with the intent and purpose that said woman engage in the practice of prostitution, debauchery, and other immoral practices, and did thereby knowingly cause said

tive offense, and on indictment No. 74, the conspiracy charge. The court sustained Perkins' after trial motion for judgment of acquittal of his conviction under indictment No. 71. Blumenfield was adjudged to serve a sentence of two years and pay a fine of $2,500. This was a single general sentence on indictments Nos. 71 and 74. Perkins was sentenced to a year and one day on his conviction on indictment No. 74. Both were acquitted by the jury on indictments Nos. 70, 72 and 73.

### Sufficiency of Indictments.

Defendants attack the indictments, claiming they are invalid because they fail to name the woman alleged to have been induced to travel in interstate commerce, etc., in violation of the statute, Title 18, U.S.C.A. § 2422.[3]

██ Firmly entrenched is the constitutional principle that, to be valid, an indictment must sufficiently advise the defendant of the nature and cause of the accusation in order that he may meet it and prepare for trial and, after judgment, be able to plead the record and judgment in bar of a further prosecution for the same offense. Rosen v. United States, 161 U.S. 29, 40, 16 S.Ct. 434, 40 L.Ed. 606; Wong Tai v. United States, 273 U.S. 77, 80, 81, 47 S.Ct. 300, 71 L.Ed. 545; Bartell v. United States, 227 U.S. 427, 431, 33 S.Ct. 383, 57 L.Ed. 583; Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252; Tubbs v. United States, 8 Cir., 105 F. 59.

██ At a pre-trial hearing on the motions to dismiss the indictments, the government attorney made this statement, "I think he (counsel for defendants) knows that the victim in this case is a woman by the name of Marilyn Ann Tollefson, and if he doesn't know that we will spread it on the record at this time * * *." He further suggested that a

bill of particulars would remedy the situation complained of. The trial court ruled that in his opinion it was not necessary for the indictments to name the woman, that this omission could be cured by a bill of particulars, stating to defendants' counsel: "you may resort to a motion for a bill of particulars, and on such a motion it will follow that the Court will require the United States Attorney to name the woman involved. That has already been indicated here openly in Court * * *."

██ We are not persuaded by defendants' argument that the omission of Marilyn Ann Tollefson's name from the indictment rendered it completely impotent as a true bill and that trials upon the indictments violated the Fifth and Sixth Amendments of the Federal Constitution. The indictments were in the language of the statute—they were not vague, but were sufficient to inform the defendants of the charge they had to meet and afforded them reasonable opportunity to prepare their defense. The omission of the name of the woman transported does not in our considered opinion render the indictment any more invalid than did the failure of the indictment to set out the contents of the obscene, lewd and lascivious letter in Tubbs v. United States, 8 Cir., 105 F. 59, and Bartell v. United States, 227 U.S. 427, 33 S.Ct. 383; or failure to allege that the victim was transported by "common carrier," see Sun Chong Lee v. United States, 9 Cir., 125 F.2d 95; or failure to allege the mode of transportation, Mellor v. United States, 8 Cir., 160 F.2d 757, 760, certiorari denied 331 U.S. 848, 67 S.Ct. 1734, 91 L.Ed. 1858. If defendants were motivated by good faith in their assertion that they would have difficulty in defending the charge, or that the omission of the name of the woman transported

---

woman to be transported as a passenger upon the line and route of said common carrier, and at the aforesaid times and places, one
 Monte Perkins, also known as
 Monte Percansky,
also named as a defendant herein, did

knowingly aid, abet, counsel, command, induce and procure the commission of the aforesaid offense."

**3.** As we have seen, indictments Nos. 70, 71, 72, 73 charged inducement of "a woman," without giving her name.

might not protect them subsequently in a plea of former jeopardy, they could have called for a bill of particulars. See Heasley v. United States, 8 Cir., 218 F.2d 86, 89, certiorari denied 350 U.S. 882, 76 S.Ct. 134, 100 L.Ed. 778; Rosen v. United States, 161 U.S. 29, 34, 40, 16 S.Ct. 434. As we have seen, the court announced that, upon request, it would require the Government to provide defendants with a bill of particulars, this notwithstanding that the woman's name had been stated in open court. Defendants failed to avail themselves of this remedy.

The lack of substance with respect to this contention becomes more apparent when it is viewed in light of indictment No. 74, which charged the conspiracy. There, Marilyn Ann Tollefson was named in each of the 13 paragraphs setting forth the overt acts committed in furtherance of the conspiracy. Finally, it should be noted that the Government at no time suggested that defendants had ever induced any person other than Marilyn Ann Tollefson to travel in interstate commerce for purposes prohibited by the Act. She and she alone was the object of defendants' unlawful activities. On this record we are satisfied that the defendants were not prejudiced because of the failure of the indictment in the respect mentioned; they were not surprised, neither did the omission prevent their ability to meet the charge and prepare for trial, and they could successfully plead the record and judgment to bar a further prosecution for the same offense.

### Motion for Examination of Grand Jury Minutes.

Denial of defendant Blumenfield's motion to inspect the minutes "for the exclusive purpose of determining how many women testified before it" is the basis for the argument that the indictment was not based upon proper evidence—the theory being that some grand jurors may have found that defendants induced woman "A" while others may have found that defendants induced woman "B".

The rule of secrecy surrounding grand jury proceedings must govern unless there is a "clear showing" of good cause. Costello v. United States, 8 Cir., 255 F.2d 389, 396, certiorari denied Cannella v. U. S., 358 U.S. 830, 79 S.Ct. 51, 3 L.Ed.2d 69. There is a presumption that the grand jury acted on sufficient evidence. United States v. Texeira, 2 Cir., 162 F.2d 169, 170; United States v. Weber, 2 Cir., 197 F.2d 237, 238, certiorari denied 344 U.S. 834, 73 S.Ct. 42, 97 L.Ed. 649. Inasmuch as there were no affidavits supporting the motion, nor any factual allegations indicating insufficiency of evidence or any other irregularity upon the part of the grand jury in delivering a true bill, the trial court was fully justified in concluding that the motion constituted a "fishing expedition" and the denial of access to the grand jury minutes was clearly proper.

### Transfer of Venue.

By separate pre-trial motions, defendants petitioned for transfer of the case to another district, as authorized by Rule 21(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., alleging that because of prejudice against defendants in the District of Minnesota, they could not obtain a fair and impartial trial in that district. Alternatively, Blumenfield requested that the proceeding be transferred to the Northern District of Illinois, sitting at Chicago, as authorized by Rule 21(b), on the theory that venue of the offense could have been laid in the first instance in the Illinois district. Perkins' motion was denied on October 26, 1959. A 3-day hearing on Blumenfield's motion was conducted and Perkins renewed his request for transfer at that time. The court denied both motions without prejudice to renew the same if upon voir dire examination of the jury panel, it was demonstrated that defendants could not obtain a fair trial in the District of Minnesota.[4]

At the hearing on this issue, the court admitted, and personally examined, nu-

---

4. After an exhaustive résumé and analysis of the facts and circumstances bearing

upon the motions for transfer of venue, the trial judge stated: "In the event I

merous local newspaper clippings, microfilm strips, and radio and television scripts, covering a period of approximately 25 years, indicating that Blumenfield had been depicted as an individual of questionable and unsavory character. Typical examples were newspaper clippings relating to his trial and acquittal for murder in 1936, together with various references to his connection with the "Kid Cann Syndicate," an organization composed of questionable characters engaged in selling liquor. Other articles indicated that a former United States Attorney in Minnesota, while a candidate for governor of that state, had accused Blumenfield of being a racketeer and participating in the looting of the local transit company.[5]

Defendants do not directly challenge the propriety of the court's action in refusing to transfer the case. Rather, they advance the contention that, because of the refusal to admit certain testimony, the court could not properly exercise its discretion in passing upon the motions to transfer.

In addition to the documentary evidence, defendants also sought to elicit oral testimony from a local radio station manager indicating that Blumenfield could not receive a fair trial in the district. This line of inquiry was objected to, the United States Attorney taking the position that the proper foundation had not been laid for such testimony, and that the witness was not qualified to pass upon the state of mind of prospective jurors. The court agreed and sustained the objection.[6]

We are not persuaded by the argument that there was insufficient basis for the court to exercise a legal discretion in his ruling on the petitions for transfer.

It is of course recognized by defendants that a petition for transfer or change of venue is addressed to the sound discretion of the court, and a denial thereof will not be disturbed unless it is demonstrated that the denial was an abuse of discretion. See Connelly v. United States, 8 Cir., 249 F.2d 576, 584, 585, certiorari denied Caudle v. U. S., 356 U.S. 921, 78 S.Ct. 700, 2 L.Ed.2d 716.

It is clear that the mere presence of adverse publicity does not per se establish proof of prejudice, or necessarily establish that a defendant will be unable to obtain a fair trial within the district. "The mere fact that a juror has read newspaper accounts relative to a criminal charge is not in itself sufficient grounds for excusing a juror." Finnegan v. United States, 8 Cir., 204 F.2d 105, 110, certiorari denied 346 U.S. 821, 74 S.Ct. 36, 98 L.Ed. 347. The ultimate question is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the *voir dire* examination. See United States v. Dioguardi, D.C.S.D.N.Y., 20 F.R.D. 33, 36.

In turning to the record, it is manifest that the denial of a change of venue was not an abuse of discretion. The transcript covers 485 pages of meticulous, detailed and individual examination of 55 prospective jurors, covering a period of three days. Forty-one of these were examined for the original panel of 30; an additional 14 were examined for a panel of 10 from which 4 alternate jurors were chosen. Concededly, many of the jurors were familiar with defendant Blumenfield's name and had read news articles from time to time in connection with his activities. Others, however, had not; jurors were drawn from a wide area,

am mistaken and examination of the jurors on voir dire demonstrates my error, then defendant will be granted the right to renew his motion for a change of venue."

5. Blumenfield was also indicted by a federal grand jury, along with others in connection with the "Twin Cities Rapid Transit Company" case. He also petitioned for transfer of venue in that case,

but on hearing for transfer in this case, withdrew his petition in the Twin Cities case. It appears that he was acquitted on all counts in that case.

6. It was agreed that the same objection and ruling would apply to a number of other news, radio and television witnesses which defendants had subpoenaed for the purpose of showing local prejudice.

some, 90 to 100 miles from Minneapolis. Judge Nordbye of the trial court was familiar with the local situation, and with 38 years of judicial service within the area, he was eminently qualified to rule upon the question of prejudice. It is significant to note that no challenge was made to the panel as a whole. Ultimately, of course, the acquittal of Blumenfield on three of the five charges strongly belies any suggestion that he could not receive a fair trial in the District of Minnesota. Any claimed error in excluding testimony alleged to be proof of actual prejudice upon the motion to transfer is without substance and borders upon mootness, inasmuch as subsequent events upon *voir dire* examination, together with the verdict of the jury, completely negate the contention that prejudice did exist. See and compare, Finnegan v. United States, supra; Connelly v. United States, supra; United States v. Dioguardi, supra; and Bianchi v. United States, 8 Cir., 219 F.2d 182, certiorari denied 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249.

### Sufficiency of the Evidence.

 The defendants urge that the evidence is insufficient to support the convictions. Realistically, this contention constitutes an effort to have us weigh the evidence. This we are not permitted to do. "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, at page 469, 68 L.Ed. 680. As we stated in Garner v. United States, 8 Cir., 277 F.2d 242, at page 244: "(t)he Government, as the prevailing party, is, of course, entitled to the benefit of all reasonable inferences which can be drawn from the evidence tending to support the verdicts."

The actual trial of this case consumed nearly five and one-half days. We have, in view of the instant assertion, given meticulous consideration to the voluminous record.

Basically, the issue here is one of credibility. The Government's case rested upon the testimony of Marilyn Ann Tollefson, an admitted prostitute. Written exhibits, such as hotel records, money order forms and telephone records tended to corroborate her testimony. Blumenfield did not testify. Perkins' testimony was flatly contradictory to that of Tollefson's in all material respects as to the relations between herself, Perkins and Blumenfield. In addition, defendants introduced some 28 written communications from Tollefson, all, with the exception of one, directed to defendant Perkins. Generally speaking, it appears that defendants, through these exhibits, hoped to establish the relationship between Perkins and Tollefson as being that of "brother and sister" and incidentally to establish the unwholesome character of Tollefson's life throughout the period in controversy. Apart from Perkins' flat denial of the material portions of her testimony, the principal efforts of the defense were directed to discrediting the testimony of Tollefson. Thus, in addition to sordid details of her life as a prostitute, there was evidence that she wrote bad checks, cheated hotel people, betrayed the confidence of her friends, that she was an alcoholic and a perjurer and greedy for money. Most of these things she admitted herself, upon cross-examination.

Obviously, the issue of credibility—of whom, and what to believe, was particularly within the province of the jury. Under these circumstances, and upon review of the record, we find that the verdicts were supported by substantial evidence.

### The Substantive Charge.

This involved transportation on May 8, 1956. Without going into great detail, the jury was entitled to find that Tollefson admittedly became a prostitute in 1953 when she was about 20 years of age. Her story, undisputed as to many salient events, reveals a sordid, lewd, and lustful existence. To state the evidence in detail would unduly and unnecessarily burden this opinion, and certainly would

not prove edifying. She testified that from November, 1953, to July, 1954, she lived in hotels in Minneapolis, Minnesota, during which time she and Blumenfield carried on an illicit affair, occasionally with sexual relations of an unnatural nature, and that she received money from Blumenfield for these activities. In July, 1954, she went to New York, where she remained until November, 1954. Thereafter she was in different large cities in the United States, such as Chicago, Illinois, and Miami, Florida, practicing her profession with various men, for money. Intermittently, however, she would return to Minneapolis, and it was these trips that produced the links in the chain sufficient to bring about the conviction of the defendants. Focusing our attention on the facts sustaining indictment No. 71, the undisputed evidence is that in May, 1956, Tollefson, after speaking to "Fergie" on the telephone, made a trip by common carrier from Chicago to Minneapolis, where reservations had been made for her at the Dyckman Hotel. She met Blumenfield at the Kenesaw Bar, where the latter told her that she should go back to the hotel and he would bring Bob Ossanna to her room. This was done, and in the presence of Blumenfield, Tollefson and Ossanna engaged in an unnatural sexual act, after which she proceeded to have sexual relations with Blumenfield. For these performances Tollefson received $200 from Blumenfield. Tollefson testified that her only reason for going to Minneapolis was for the immoral purpose of carrying on prostitution with Blumenfield, for money.

The gravamen of the offense proscribed by Title 18, U.S.C.A. § 2422, is knowingly persuading, inducing, enticing or coercing any woman to go from one place to another in interstate commerce, for the purpose of prostitution or debauchery, or for any other immoral purpose, whether with or without the consent of the woman. Under the evidence discussed above, the question of Blumenfield's guilt or innocence was clearly for the jury. There was substantial evidence, uncontradicted in fact, from which the jury reasonably and legitimately could infer that Tollefson's May, 1956, trip was induced by Blumenfield, and for the purposes prohibited by the statute. See and compare, Caminetti v. United States, 242 U.S. 470, 486, 37 S.Ct. 192, 61 L.Ed. 442; Cleveland v. United States, 329 U.S. 14, 17, 67 S.Ct. 13, 91 L.Ed. 12; Cwach v. United States, 8 Cir., 212 F.2d 520, 527; Holder v. United States, 8 Cir., 271 F.2d 214, certiorari denied 361 U.S. 933, 80 S.Ct. 372, 4 L.Ed.2d 354, involving prosecution under § 2421, but analogous in principle; Berry v. United States, 8 Cir., 283 F.2d 465, also involving prosecution under § 2421, but clearly analogous.

### Conspiracy Charge.

Defendants insist that "(t)here simply is not any evidence that Perkins ever conspired with Blumenfield to transport, etc., Tollefson, * * * that the vital element of knowledge is missing so far as Perkins is concerned and therefore criminal conspiracy is not attributable to him or to Blumenfield." In resolving this issue, we have in mind certain rules so clearly enunciated by this Court in Phelps v. United States, 160 F.2d 858, 867, certiorari denied 334 U.S. 860, 68 S.Ct. 1525, 92 L.Ed. 1780:

" * * * (u)nder the federal statute conspiracy is a joining of intentions to engage in or further some unlawful action together, plus the taking of any step by one or more of the parties toward effecting the mutual object. * * * Such a joining of intentions into a conspiracy may, and ordinarily only can, be established by inference from evidence of relationships and conduct and other probative circumstances. (citing authorities). Once there is satisfactory proof that a conspiracy has been formed, the question of a particular defendant's connection with it may be merely a matter of whether the stick fits so naturally into position in the fagot as to convince that it is part of it."

Conspirators ordinarily do not announce that they have joined their

efforts for the purpose of engaging in or furthering some unlawful scheme or plan —rather they are inclined to cover their machinations, thereby casting upon the prosecution the burden, sometimes difficult, of establishing the conspiracy, and the overt acts in consequence thereof, by circumstantial evidence,—by actions of the conspirators. "Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'" Glasser v. United States, 315 U.S. 60, at page 80, 62 S.Ct. 457, at page 469. This rule has received abiding recognition. See Williams v. United States, 4 Cir., 271 F.2d 703, 706; Holder v. United States, supra, 271 F.2d 214; Marx v. United States, 8 Cir., 86 F.2d 245, 250.

There is no direct evidence that Blumenfield and Perkins entered into a scheme to procure the transportation of Tollefson in interstate commerce for immoral purposes, but there are circumstances, based on probative evidence, sufficient to support a reasonable inference of such a conspiracy. To begin with, Perkins, a married man, admitted having sexual intercourse with Tollefson "a few times at the Mark Twain (Hotel) in the early part of '54." He and Blumenfield were close acquaintances throughout the period covered by the indictments. In June, 1954, Tollefson was arrested in Minneapolis for issuing bad checks. She testified that she first tried to contact Blumenfield, and being unable to do so, called Perkins, who responded immediately; that Perkins informed the police officers that he would call Blumenfield, and did in the presence of Tollefson; that shortly thereafter Perkins told her "that Fergie was sending somebody down right away and not to worry, that it would be taken care of right away." Tollefson testified further that Blumenfield sent the money to take up the bad checks, which amounted to more than $300.

She also testified that in July, 1954, she sent Blumenfield a telegram from New York requesting $200 and that the next day Blumenfield called her and "told me never to send him another telegram, ever, that I should call him, or if I couldn't contact him I should contact Perkins." Thereafter, and from time to time throughout the period covered by the indictments, Tollefson was in contact with Perkins. She wrote him numerous letters in some of which she professed her love for Perkins. She frequently requested money from Perkins, and although the evidence showed that Perkins had a very modest income, with a wife and three children to support, he nevertheless sent Tollefson money on different occasions, purchased clothing and other articles for her, and paid a substantial hospital bill which she had incurred. There was evidence that Perkins knew that Tollefson was prostituting herself. This is borne out rather strongly by several of her letters to him. Additionally, she testified that "Monte always wanted me to stay away from what he called two-bit hoodlums, jerks that hung around bars. He always told me to go after the real money * * * the big men." Furthermore, Perkins usually met Tollefson at the airport in Minneapolis when she arrived from Chicago, and the inference is clear that Perkins knew that Tollefson engaged in illicit affairs with Blumenfield after her arrival in Minneapolis.

That Perkins had knowledge concerning Tollefson's activities with Blumenfield is further substantiated by the events surrounding her appearance before the federal grand jury in February, 1957. While in Chicago and upon learning that a subpoena had been issued for her appearance before the grand jury, she testified that she contacted Perkins by telephone and requested him to find out "what it was all about;" that the same evening Perkins called back and informed her that the grand jury was trying to indict Blumenfield on "moral turpitude charges," and requested her to notify him when she would arrive in Minneapolis and that he would meet her; that she was met at the airport by Perkins who took her to the federal court house; that at that time she told Perkins that she had discussed her appear-

ance before the grand jury with a lawyer in Chicago, who advised her "to take the Fifth Amendment," but not to lie. "Mr. Perkins advised me that Mr. Blumenfield did not want me to take the Fifth Amendment, but if I insisted upon doing so he would have a lawyer for me and a bondsman; but he would prefer that I not take the Fifth Amendment, but I should deny to the Federal grand jury that I ever had any sexual relationships with Fergie or that I had ever received any money from Fergie." She testified that she followed these instructions in her appearance before the grand jury by categorically denying ever having sexual relations with Blumenfield, thus perjuring herself at the request of Monte Perkins. The secrecy of the grand jury proceedings with respect to her testimony was lifted by the court without objection and Tollefson's testimony before that body was related verbatim. It discloses that Tollefson denied any wrongdoing with Blumenfield. She testified that following her appearance before the grand jury, she went to Sugar's Bar where she met Perkins and informed him of what had transpired; that he then called Blumenfield, and she and Perkins went to the Kenesaw Bar where they met Blumenfield, and told him what had transpired, and that Blumenfield's only comment was "that they were getting pretty low when they were trying to indict him on his sexual life."

Without spelling out further details, we are firmly convinced that there was sufficient substantial evidence to fully support an inference that Perkins and Blumenfield had entered into a scheme to carry out and further Blumenfield's unlawful activities. As Judge Nordbye stated in his well reasoned memorandum opinion filed in connection with his action on after trial motions: "The evidence would fully support a finding that Perkins was a front man for Blumfeld (sic) and a partner in the promotion of his interstate illicit activities in the transportation of the Tollefson woman."

 The acquittal of Perkins on the four substantive charges does not, as suggested by defendants, require an acquittal on the conspiracy charge under the doctrine of res judicata. In Garner v. United States, in dealing with a similar question, we said, 277 F.2d 242, at page 245: "A substantive offense and a conspiracy to commit it are separate offenses. Pinkerton v. United States, 328 U.S. 640, 643–644, 66 S.Ct. 1180, 90 L.Ed. 1489. Furthermore, inconsistency in a verdict on the separate counts of an indictment or information does not entitle a defendant to the reversal of a conviction. Dunn v. United States, 284 U.S. 390, 393–394, 52 S.Ct. 189, 76 L.Ed. 356; (other cases cited)." Although the evidence may have been insufficient to convince the jury or Judge Nordbye that Perkins was guilty of aiding and abetting the transportation on the four specific dates alleged in the substantive indictment, the conviction of conspiracy finds ample support in the record.

### Evidentiary Matters.

 Defendants complain and assign as error the action of the court in sustaining objection to Blumenfield's offer to prove that it was one Hy Brodie rather than Blumenfield who had committed the offenses for which Blumenfield was indicted; sustaining objection to defendants' offer of proof designed to establish Tollefson's bias in favor of the prosecution resulting from her stay in the Duluth Hotel; error in permitting the prosecution, over objection, to examine Tollefson as to testimony she gave to the grand jury in February, 1957.

We have examined these assignments carefully, and find no error. Defendants were represented by able and skilled trial lawyers who were given a wide berth in their cross-examination of all witnesses and particularly Tollefson. Indeed, it is our impression that the court generously permitted cross-examination on matters that were collateral to the issues at trial. The rule is that the limits of cross-examination upon collateral matters are peculiarly within the discretion of the trial court, and unless there is a plain abuse of discretion, the court's action will not

be disturbed.[7] As stated, the defense made every effort to discredit Tollefson's testimony. Evidence regarding her affairs in Chicago and Las Vegas with other men, and her conduct while being held as a material witness were designed for this purpose. Clearly, there was no abuse of discretion in excluding further evidence along this line.

 As noted above, Tollefson was permitted to testify as to her conversation with defendant Perkins in connection with her appearance before the grand jury. Upon objection of Blumenfield's counsel, the court first ruled that the testimony would be binding only upon Perkins; however, after the witness had concluded her testimony, implicating Blumenfield, the court ruled that the testimony would be received as to both defendants. Blumenfield now complains that the admission of the testimony violated the teachings of Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790. Krulewitch is not apposite and controlling, because there the conspiracy had ended prior to the time the conversation complained of took place. Here, the conspiracy was in existence, at least there was evidence justifying such a conclusion, when Tollefson conversed with Perkins. The admission of the testimony as to both defendants finds support in the rule that declarations of one conspirator may be used against the other not present on the theory that the declarant is the agent of the other and the admissions or statements of one are admissible against both. Lutwak v. United States, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593; Cwach v. United States, 8 Cir., 212 F.2d 520, 525. Here, the evidence indicated that the statement was made with full authority of Blumenfield, and that he entirely approved of the perjury before the grand jury.

While objection was made to the testimony by Blumenfield, it appears that his counsel cross-examined Tollefson extensively on the subject—he endeavored to exploit her perjury for his client's benefit, but in any event, the ruling of the court was proper.

The record demonstrates that Judge Nordbye presided over the trial of this hotly contested case with patience and understanding. His rulings were motivated by a sincere desire to accord the parties a fair and impartial trial. His extensive charge to the jury covering approximately 66 pages of the transcript was viewed by the defendants as being so fair that they failed to take exceptions to any part thereof. He carefully considered all questions raised by defendants on their after trial motions, as manifested by his entry of a judgment of acquittal of Perkins on one charge. There was no error.

The judgments are

Affirmed.

---

7. See United States v. Manton, 2 Cir., 107 F.2d 834, 845, certiorari denied 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012.