**UNITED STATES of America**
v.
**Robert Benjamin BAKER.**
**Crim. No. 15892.**

United States District Court
W. D. Pennsylvania.
Nov. 23, 1960.

---

John Gavin, First Asst. U. S. Atty., Pittsburgh, Pa., for United States.

M. Barney Cohen, Pittsburgh, Pa., for defendant.

MARSH, District Judge.

The defendant, Baker,[1] was convicted on a three-count indictment which

---

[1]. The defendant was designated as Robert Benjamin Baker in the indictment, although his true name is Robert Bernard Baker (T., p. 4).

charged him with having violated the Taft-Hartley Act, § 186(b), Title 29 U.S.C.A.,[2] on three occasions. Thereafter, he presented motions for judgment of acquittal and, in the alternative, for a new trial. The reasons advanced in support of his motion for judgment of acquittal and a new trial may be summarized as follows:

1. There was insufficient evidence from which the jury could find that the money accepted by defendant was received other than as loans.

2. There was insufficient evidence from which the jury could find that the defendant was a representative of any employees of Exhibitors' Service Company (ESCO).

3. The testimony of the defendant before a Senate Committee (Select Committee on Improper Activities in the Labor or Management Field) should be stricken as violative of Title 18 U.S.C. § 3486, and that said testimony was improperly received in evidence.

The court is of the opinion that both motions should be denied.

■ Since the defendant was found guilty as charged, the evidence and all reasonable inferences to be drawn therefrom must be viewed in a light most favorable to the Government. Connelly v. United States, 8 Cir., 1957, 249 F.2d 576.[3] Thus viewed, the evidence disclosed that during December, 1957, and January, 1958, ESCO was a corporation doing business as a common carrier and lawfully entitled to transport goods, inter alia, between points in Pennsylvania and eastern Ohio; that it employed members of Locals 211 and 249 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America (International Union); that these employees were engaged in an industry affecting commerce; and that George F. Callahan, Jr. was president and treasurer of ESCO.

The International Union operated under a constitution [4] which provides that the International Convention is the supreme governing authority; the Union consists of chartered Local Unions, Joint Councils and Area Conferences; the Locals are affiliated with a Joint Council and with an Area Conference; all these bodies are subordinate to the International Union which has jurisdiction over all member workers.

The officers of the International Union are a General President, General Secretary-Treasurer, and 13 Vice-Presidents, all of whom comprise a General Executive Board. Extensive supervisory power is given to the General President and the General Executive Board.

Defendant was an organizer and representative of the Central Conference (T., pp. 42–43). He took orders from James Hoffa and Harold Gibbons. Since 1952 to January 28, 1958, Hoffa was a Vice-President of the International Union, a member of the General Executive Board, and Chairman of the Central Conference, which includes eastern Ohio where some of ESCO's operations were conducted.

2. This Act was amended September 14, 1959, Pub.L. 86–257, Title V, § 505, 73 Stat. 537, but the amendment is not applicable to this case.

3. In the cited case, it was stated at page 585:
"In considering the question of the sufficiency of the evidence to go to the jury and to sustain the verdict we must view the evidence in a light most favorable to the prevailing party, in this case the government, and the prevailing party is entitled to all such favorable inferences as may reasonably be drawn from the facts and circumstances proven. If when so viewed, reasonable minds might reach different conclusions then the issue is one of fact to be submitted to the jury * * *."
See also, Northcraft v. United States, 8 Cir., 1959, 271 F.2d 184, 187 and Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, wherein it was stated:
"It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it."

4. Government's Exhibit 1.

ESCO also conducted operations in Pennsylvania where it had its principal place of business; Pennsylvania is included in the Eastern Conference. Hoffa had been elected General President in October, 1957, and took office on January 28, 1958. Gibbons was Secretary-Treasurer of the Central Conference; he had been elected Vice-President in the latter part of 1957 and took that office also on January 28, 1958.

In the latter part of 1957, Locals 211 and 249 were engaged in a jurisdictional dispute, and ESCO was trying to negotiate a new contract with Local 211, whose President was one Cozza. ESCO was threatened with a strike. ESCO's president, Callahan, and one Weinheimer, an ESCO salesman, consulted Hoffa about ESCO's troubles. As Vice-President and member of the General Executive Board, Hoffa discussed the strike "with everybody I could get hold of, to try to straighten it out" (T., p. 42). As Vice-President, Hoffa brought the jurisdictional matter to the General Executive Board (T., p. 45).

Hoffa discussed ESCO's troubles with defendant, who worked under Hoffa's personal supervision as Chairman of the Central Conference, because they "affected some part of [ESCO's] Ohio operation, which is Central Conference" (T., pp. 53, 54; see also T., p. 44).

It was stipulated that the General Executive Board in August, 1957, took action in regard to the jurisdictional dispute between Locals 211 and 249, which involved ESCO (T., p. 89).

On December 18, 1957, Local 211 went on strike against ESCO.

After the strike started, the defendant was in Pittsburgh on two occasions in December, 1957, and in the latter part of January, 1958. His expenses were paid by the Central Conference; the vouchers were approved by Hoffa and Gibbons.[5]

During the strike, Callahan was introduced to defendant by Weinheimer, and discussed ESCO's labor problems. Defendant promised to help Callahan get his labor problems settled and stated that he would " * * * endeavor and arrange a meeting with Mr. Cozza [President of Local 211] who at that time would not talk to anybody from management * * *" (T., pp. 134–135). Callahan gave the defendant $100 to " * * * cover your expenses for such meeting or meetings * * *" (T., p. 135). Defendant accepted this money.

The following day, Callahan, Weinheimer, Cozza and defendant met at Local 211 headquarters. Several days later Callahan, accompanied by Weinheimer, again met the defendant at a bar in a Pittsburgh hotel. After a short discussion, defendant left the bar to check out of the hotel. Weinheimer also left and returned in a few minutes, at which time Callahan gave Weinheimer $50.[6] Thereafter Callahan left the bar, met the defendant in front of the hotel, and gave the defendant $75 saying: "This will see you back to Detroit." Defendant accepted the $75.

In the latter part of January, 1958, Callahan again met defendant at a Pittsburgh hotel. The defendant " * * * brought up that he had been promised— or things weren't as good as they might be * * *" and said that " * * * he had been promised $300 by some party —he didn't say who * * *". Callahan offered the $300 to defendant who stated that he would " * * * accept it on a loan basis * * *".

The strike ended on February 4, 1958 (T., p. 100). Thereafter, on other occasions Callahan sent defendant other money totalling $600 " * * * as an act of a friend and on the basis of a loan * * *". The total money paid defendant was $1,125.[7]

Mr. Callahan testified that he considered all money given to defendant were loans, but that no note or other evidence of indebtedness was given him by defend-

---

5. Government's Exhibits 2, 3, 11.

6. This $50 seems to have been given to defendant. See defendant's Exhibit A.

7. Government's Exhibit 16.

ant; that the money probably came from ESCO's funds; that the defendant had never repaid the money up to the time of trial.

Callahan did not request defendant to repay the money until after the appearance of both before the Senate Committee in 1958; the request was in writing and signed "Exhibitors' Service Company, G. F. Callahan, Jr., President". No loan account had ever been set up for defendant on ESCO's books as required of common carriers by the Interstate Commerce Commission (T., pp. 169–170).

After the foregoing evidence had been received, the Government offered to introduce the testimony given by defendant in 1958 to the Senate Committee. Defendant objected on the ground that the corpus delicti had not been proved. The objection was overruled (T., p. 182).

 In the court's opinion, the circumstantial evidence tending to show that defendant was an authorized labor representative of ESCO's employees was sufficient to establish the trustworthiness of his admission to that effect given to the Senate Committee, and the circumstantial evidence plus the direct evidence that the defendant received money from Callahan, viewed in a light favorable to the prosecution, established independently the other necessary elements of the offenses charged. The corroboration sufficiently supported the essential facts admitted by defendant to justify the jury to infer that in truth he was a designated labor representative sent by his superiors to act on behalf of the ESCO teamster employees, and, in fact, did so act on their behalf. These facts plus the other evidence that he received money from their employer was sufficient to find guilt beyond a reasonable doubt. Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192;[8] Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101. We think the

ruling was proper and defendant's testimony before the Senate Committee was properly received.

Defendant told the Senate Committee that *he worked under the immediate direction of Harold Gibbons and James Hoffa;* that he knew ESCO had a strike; that he *"was sent * * * to try and arbitrate and get the contract signed and settled. We had a meeting with the proprietor and also with the union."* (T., pp. 186–187.) He stated that he had discussed ESCO's labor problems with Callahan. He said: "It is my job to try and end strikes as well as organize them." (T., p. 190.)

When asked what he, as a Central Conference organizer, was doing in Pittsburgh, defendant replied: "It doesn't mean that I haven't left the area, if I have to go to another area and try to settle a strike difficulty, going to New York or anywhere in the country, if you can help a brother Teamster." (T., p. 190.)

Defendant admitted that he specifically went to Pittsburgh for the purpose of undertaking to settle the strike for ESCO. He also testified that he believed he had something to do with settling it.

In our opinion, the evidence was sufficient for the jury to find as a fact that the defendant, as an organizer of the Teamsters' Union, was sent to represent ESCO's employees during a strike at the direction of Gibbons, an officer of the Central Conference, or by Hoffa, who not only was Chairman of the Central Conference but also Vice-President and member of the General Executive Board, the most powerful body of the International Union which has jurisdiction of all Teamster workers, or by both Gibbons and Hoffa. The defendant admitted he was so sent. It must be remembered that the Executive Board had taken action with respect to ESCO. The jury could hardly doubt that these top officers were responsible

---

8. In the Smith case, it was stated in 348 U.S. at page 156, 75 S.Ct. at page 199: "It is agreed that the corroborative evidence does not have to prove the offense beyond a reasonable doubt, or even by a preponderance, as long as there is substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that defendant is guilty."

representatives of all Teamsters, including ESCO's employees, authorized by them to act in their behalf, and as such had power to delegate defendant to represent them in their labor troubles with ESCO. As such, defendant was authorized, empowered and designated, directly or indirectly, through the International Union's organizational framework to represent ESCO's employees in a substantial matter relating to negotiations with their employer with respect to a strike, jurisdictional dispute, and contract which involved their wages, hours and working conditions. As such, defendant was a responsible representative of a Labor Union whose members worked for an employer engaged in interstate commerce. United States v. Ryan, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335; Brennan v. United States, 8 Cir., 1957, 240 F.2d 253.

There was direct evidence that defendant participated in negotiations between Cozza, President of Local 211, and Callahan, President of ESCO.[9]

The evidence was more than sufficient to justify a finding that defendant accepted money on three occasions from Callahan as charged in the indictment, under circumstances which strongly indicated that they were made by Callahan as compensation for interceding with Cozza and as consideration for the resulting labor peace, and not as loans.[10]

■ It is true that Hoffa denied that he sent defendant to Pittsburgh to represent ESCO's employees (Gibbons was not called as a witness) and that Callahan said he considered the money he gave defendant as loans, but it is well settled that "in prosecutions of federal criminal cases, the Government is not bound by testimony of its witnesses, and the jury may believe part of what a witness said and disbelieve the remainder." And this is so even though the direct evidence of the Government's witness militates against the circumstantial evidence. United States v. Gordon, 3 Cir., 1957, 242 F.2d 122; [11] for circumstantial evidence in the concrete, may be infinitely stronger than direct evidence.[12] In the circumstances of this case it could hardly be expected that the jury would find that the three payments made by Callahan to defendant were loans.

■■ In his motions and brief, defendant for the first time contended that his admissions made to the Senate Committee could not be used in court against him. He cites the Act of June 25, 1948, c. 645, 62 Stat. 833, 18 U.S.C. § 3486.[13] The Government contends that this section must be considered repealed by the amendment of August 20, 1954, c. 769, 68 Stat. 745, and we agree. The amendatory Act in its pertinent part provides:

*"Be it enacted by the Senate and House of Representatives of the*

---

9. T., pp. 136–138; Government's Exhibit 7.

10. The jury was instructed that they must consider whether the money received was accepted or received as a loan as to each count, and if they found from the evidence that the defendant took money on the occasions mentioned in the particular count as a loan from Callahan, then the defendant should be found not guilty as to that count. This was the ruling of District Judge Sugarman in the case of United States v. Freuhauf, Criminal No. 159–138 (S.D.N.Y. Feb. 18, 1960).

11. See also, United States v. Malfi, 3 Cir., 1959, 264 F.2d 147; United States v. Morris, 2 Cir., 1959, 269 F.2d 100, 103; cf. Johnson v. Baltimore & O. R. Co., 3 Cir., 1953, 208 F.2d 633.

12. See United States v. Gordon, supra, f. n. 1, 242 F.2d at page 126.

13. 18 U.S.C. § 3486 (1946 ed., Supplement V, 1952, page 1013), 18 U.S.C.A. § 3486, page 344, provides:
"§ 3486. Testimony before Congress; immunity
"No testimony given by a witness before either House, or before any committee of either House, or before any joint committee established by a joint or concurrent resolution of the two Houses of Congress, shall be used as evidence in any criminal proceeding against him in any court, except in a prosecution for perjury committed in giving such testimony. But an official paper or record produced by him is not within the said privilege. June 25, 1948, ch. 645, § 1, 62 Stat. 833, [effective Sept. 1, 1948.]"

*United States of America in Congress assembled,* That title 18, United States Code, section 3486, is amended to read as follows:

" '§ 3486. Compelled testimony tending to incriminate witnesses; immunity

" '(a) In the course of any investigation relating to any interference with or endangering of, or any plans or attempts to interfere with or endanger the national security or defense of the United States by treason, sabotage, espionage, sedition, seditious conspiracy or the overthrow of its Government by force or violence, no witness shall be excused from testifying or from producing books, papers, or other evidence before * * * any committee of either House * * * on the ground that the testimony or evidence required of him may tend to incriminate him * * *. But no such witness shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is so compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, nor shall testimony so compelled be used as evidence in any criminal proceeding (except prosecutions described in subsection (d) hereof) against him in any court.

" '(b) * * *

" '(c) * * *

" '(d) * * *

"Sec. 2. The analysis of chapter 223 of title 18, United States Code, is amended by striking out

" '3486. Testimony before Congress; immunity.' and inserting in lieu thereof the following:

" '3486. Compelled testimony tending to incriminate witness; immunity.'

"Approved August 20, 1954."

It is immediately noted that former § 3486 has been eliminated from new § 3486. The enacting clause of the new section states that it "is amended to read as follows:"; it did not state that it was to be added to the old section; also a different catchline or heading is enacted which differs from the catchline or heading that preceded old § 3486 and is inconsistent therewith. Enactment of a different catchline is to be given significant effect in determining the intention of Congress. Amalgamated Ass'n etc. v. Pennsylvania Greyhound Lines, 3 Cir., 1951, 192 F.2d 310. Also, by enactment the analysis of chapter 223 of Title 18 is changed. The general object of the new act as expressed in its title is clearly more restrictive and repugnant to the broad purpose of the former statute.

From these indications contained in the amendment itself, the court finds that Congress clearly intended that the amendatory statute was to be a complete substitution for the provisions of former § 3486. This intent is further reflected in Supplements II, III, IV, and V of the 1952 edition of the United States Code, Title 18, § 3486, as well as the 1958 edition, each of which omits the provisions of old § 3486.

█ It was an early recognized principle of statutory construction that the words "amended to read as follows" in a statutory enactment set forth a legislative intent that all the law on the subject was to follow and that such language "evinces an intention to make the new statute a substitute for the amended statute exclusively",[14] and that there is no need for inconsistency in order for the amendment to operate as a repeal. Endlich, Interpretation of Statutes (1888), § 196; Crawford, Statutory Construction (1940), §§ 304, 305; Sutherland, Statutory Construction, 3d ed., vol. 1, § 1932. The use of the words "amended to read as follows" coupled with the new catchline of § 3486, plus the fact that the new section is substantially similar to the for-

14. Crawford, Statutory Construction (1940), § 304, p. 619.

mer section insofar as it deals with compelled testimony [15] and provides it shall not be used as evidence in any criminal proceedings, leads inevitably to the conclusion that new § 3486 is a complete substitution for old § 3486. It is eminently clear by the catchline to the new section that it is much narrower in scope than the former section; Congress deliberately did away with the broad and imperfect immunity granted by the old section. See: Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110.

What appears from the face of the amendment finds full support in its legislative history. The conclusion to be drawn from that history is that the amendment was to be a complete substitution for the former section. Indeed, the Reports of both the Senate and House of Representatives Judiciary Committees clearly indicate that "section 1 of the bill substitutes a new section for section 3486, title 18, United States Code". (Page 8 of the House of Representatives Report No. 2606, 83d Congress, 2d Session; and pages 1 and 2 of Senate Report No. 153, 83d Congress, 1st Session.) Further, both the Reports unmistakably show that the then existing law was to be stricken in its entirety. This was done in the House Report by the catchline of former § 3486 and the entire provisions of the former section being set off by black brackets in compliance with clause 3 of Rule XIII of the Rules of the House of Representatives (pp. 9–10). See also, the "Changes in Existing Law" set forth in the Senate Report on page 13 in compliance with subsection (4) of Rule XXIX of the Standing Rules of the Senate.

For these reasons we reject the defendant's argument that the amendment contains *two* immunity provisions, one excluding as evidence in subsequent criminal proceedings testimony given before Congress, and another which, in certain named circumstances not present here, prohibits prosecution or subjection to any penalty or forfeiture on account of any matter concerning which a witness has been compelled to testify *nor* shall such compelled testimony be used as evidence in any criminal proceeding. Mr. Justice Frankfurter speaking for the Supreme Court in Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511, presents an analysis of new § 3486 whch we understand as stating that it contains *one* immunity provision with two parts.

Defendant approved a stipulation by his counsel that he was fully advised of his rights before the Senate Committee, that he was represented by counsel, that he was advised "he could take the Fifth Amendment", and that "he chose to testify in lieu of taking the Fifth Amendment" (T., pp. 183–184).

It therefore appears that at the Committee investigation defendant knowingly and deliberately failed to claim his Constitutional privilege to refuse to incriminate himself. Under the then state of the law defendant did not obtain any immunity and his admissions could be used against him legally in the criminal trial. United States ex rel. Vajtauer v. Comm'r of Immigration, 273 U.S. 103, 113, 47 S.Ct. 302, 71 L.Ed. 560; United States v. Murdock, 248 U.S. 141, 148, 52 S.Ct. 63, 76 L.Ed. 210; Rogers v. United States, 340 U.S. 367, 370–371, 71 S.Ct. 438, 95 L.Ed. 344.

It is our opinion that the weight of the evidence supports the verdict.

An appropriate order will be entered denying the motions for judgment of acquittal and for a new trial.

---

15. The Supreme Court held in Adams v. Maryland, 347 U.S. 179, 74 S.Ct. 442, 98 L.Ed. 608, that there was sufficient compulsion to grant immunity under former § 3486 where party testifying was not a *volunteer* before the Committee, but was there because of a summons which if disobeyed would subject party to a possible fine and imprisonment.