**Edmund DINIS et al., Plaintiffs,**

**v.**

**John A. VOLPE, as Governor of the Commonwealth of Massachusetts,**

**and**

**Elliot L. RICHARDSON, as Attorney General of the Commonwealth of Massachusetts,**

**and**

**Kevin H. White, as Secretary of the Commonwealth of Massachusetts, Defendants.**

**Civ. A. No. 66–767–G.**

United States District Court
D. Massachusetts.

Feb. 15, 1967.

Edmund Dinis, New Bedford, Mass., for plaintiffs.

David Berman, Asst. Atty. Gen., Boston, Mass., for defendants.

Before WOODBURY,[*] Senior Circuit Judge, and WYZANSKI and GARRITY, District Judges.

## OPINION OF THE COURT

WOODBURY, Senior Circuit Judge.

This suit is brought by seven registered voters (one in each of the Third, Fourth, Fifth, Sixth, Ninth, Tenth and Eleventh Congressional Districts of the Commonwealth of Massachusetts), in their own behalf and in behalf of other eligible voters similarly situated, against the Governor, the Secretary of State and the Attorney General of Massachusetts. The prayer is for a declaration that the current Massachusetts Apportionment Act, Chapter 315, Acts of 1962, General Laws Chapter 57 § 1, as amended, is unconstitutional and for an injunction restraining the defendants "from assuming any responsibility or taking any action with respect to the nomination or election of Representatives to the Congress of the United States" from the Congressional Districts as they are now constituted. There being no genuine issue as to any material fact the case comes before this duly constituted district court of three judges on cross motions for summary judgment.

Application of the provisions of § 22 of the Act of June 18, 1929, providing for the apportionment of Representatives in Congress, 46 Stat. 26, 27 as amended 2 U.S.C. § 2a, resulted after the 1960 census in the reduction of the Massachusetts delegation to the National House of Representatives from 14 to 12. Upon notification of this change as federal law requires, the Massachusetts House and Senate by joint order established a joint special committee "for the purpose of recommending a new division of the commonwealth into congressional districts in conformity with existing law." The committee split strictly along party lines and filed majority and minority reports. The Massachusetts Legislature did not adopt either report but enacted an apportionment of its own. The population discrepancies among the congressional districts as established by the legislature and among the districts as they would have been had either the majority or minority report of the joint special committee been adopted are shown by the following table, in which the "Deviation"

[*] Sitting by designation.

figures denote the variations from an ideal or average size district and the "%" figures denote the percentages of such deviations:

| DISTRICTS | LEGISLATURE'S PLAN | | | COMMITTEE MAJORITY PLAN | | | COMMITTEE MINORITY PLAN | | |
|---|---|---|---|---|---|---|---|---|---|
| | POPULATION | DEVIATION | % | POPULATION | DEVIATION | % | POPULATION | DEVIATION | % |
| 1 | 376,336 | −52,712 | −12.4 | 404,541 | −24,611 | −5.7 | 404,727 | −24,425 | −5.7 |
| 2 | 388,578 | −40,470 | −9.3 | 406,675 | −22,477 | −5.2 | 408,278 | −20,874 | −4.9 |
| 3 | 441,558 | +12,510 | +3. | 405,036 | −24,116 | −5.6 | 407,028 | −22,124 | −5.2 |
| 4 | 444,069 | +15,021 | +3.5 | 406,311 | −22,841 | −5.3 | 415,611 | −13,541 | −3.2 |
| 5 | 450,716 | +21,668 | +5.1 | 445,593 | +16,441 | +3.7 | 448,721 | +19,569 | +4.6 |
| 6 | 452,956 | +23,908 | +5.6 | 449,429 | +20,277 | +4.8 | 452,956 | +23,804 | +5.6 |
| 7 | 392,350 | −36,698 | −8.6 | 408,088 | −21,064 | −3.9 | 408,692 | −20,460 | −4.8 |
| 8 | 420,596 | − 8,452 | −1.9 | 449,120 | +19,968 | +4.7 | 450,129 | +20,977 | +4.9 |
| 9 | 478,962 | +49,914 | +11.7 | 450,438 | +21,286 | +5. | 407,839 | −21,313 | −5. |
| 10 | 456,308 | +27,260 | +6.3 | 445,396 | +16,244 | +3.6 | 445,200 | +16,048 | +3.7 |
| 11 | 441,180 | +12,132 | +2.8 | 426,830 | − 2,322 | −.5 | 453,527 | +24,375 | +5.7 |
| 12 | 404,969 | −24,079 | −5.6 | 452,438 | +23,276 | +5.5 | 447,187 | +18,135 | +4.2 |
| Total | 5,148,578 | | | 5,149,895 | | | 5,149,895 | | |
| Ideal (1/12) | 429,048 | | | 429,152 | | | 429,152 | | |
| Variation between smallest and largest | 102,626 (1st-9th) | | | 47,887 (1st-12th) | | | 48,790 (1st-11th) | | |
| Ratio smallest to largest | 1 to 1.27 | | | 1 to 1.12 | | | 1 to 1.12 | | |

It is apparent that under the plan adopted by the legislature the difference in population between the largest and smallest districts, viz., the 1st and 9th, is 102,626, or approximately $\frac{1}{4}$ the size of an ideal district. Under the plans proposed in the majority and minority reports the differences between the largest and smallest districts were slightly less than 50,000, or approximately $\frac{1}{10}$ the size of an ideal district.

In Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), decided some two years after the legislative apportionment here under consideration, the Supreme Court laid down the constitutional principles to be applied by state legislatures in establishing congressional districts. It said, pages 7 and 8, 84 S.Ct. page 530: "We hold that, construed in its historical context, the command of Art. I, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." That is to say, the Court in *Wesberry* applied under Art. I § 2 the "one person, one vote" principle, see Gray v. Sanders, 372 U.S. 368, 381, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), to congressional districting which it had applied earlier in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962), under the Equal Protection Clause of the Fourteenth Amendment to districting for the election of representatives to the lower houses of state legislatures.[1]

■ Although seats in both houses of bicameral state legislatures and seats in the United States House of Representatives must be apportioned on the basis of population, mathematical precision is not constitutionally required. The Court in Reynolds v. Sims, 377 U.S. 533, 577, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), rec-

ognized that arithmetical equality of districts is a practically unattainable ideal. Moreover, even if arithmetical equality of districts based upon the latest census (reapportionment more frequently than after each decennial census is not constitutionally necessary, Reynolds v. Sims, supra, 583, 84 S.Ct. 1393), could be achieved by disregarding locally established voting precincts, which we do not understand to be a constitutional requirement, numerical equality would not obtain for long because of inevitable shifts in population from one area of a state to another. Recognizing these facts the Supreme Court has not set mathematical bounds to the scope of constitutionally permissible deviation from the ideal quotient.[2] On the contrary the Court has specifically warned that apportionment cases are not to be decided by solving an exercise in grade school arithmetic. In Roman v. Sincock, 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964), the Court was careful to point out that in affirming the decision below it did not mean to indicate any approval of the district court's attempt to state in mathematical language the constitutionally permissible bounds of discretion in deviating from apportionment according to population. It said:

"In our view the problem does not lend itself to any such uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause. Rather, the proper judicial approach is to ascertain whether, under the particular circumstances existing in the individual State whose legislative apportionment is at issue, there has been a faithful adherence to a plan of population-based

1. It applied the same principle to districting for the election of representatives to the upper houses of bicameral state legislatures in Reynolds v. Sims, 377 U.S. 533, 568–571, 84 S.Ct. 1362, 12 L.Ed. 2d 506 (1964).

2. The ideal quotient, or ideal ratio, is the number obtained by dividing the number

of inhabitants by the number of their representatives to be chosen. In this case it is the population of Massachusetts as of the last census, 5,148,578, divided by the number of representatives allocated to it, 12, or 429,048.

representation, with such minor deviations only as may occur in recognizing certain factors that are free from any taint of arbitrariness or discrimination."

 This language applies specifically to the apportionment of Representatives to state legislatures. Nevertheless, we think it clear that the language also applies to the apportionment of Representatives to the United States Congress. Of course figures are essential to show that population disparity of districts is *de minimis,* or, on the other hand, to show that population disparity is so gross as to suggest, if not clearly to establish, legislative disregard for the "one person, one vote" principle. The actual test, however, is not mathematical but is what is "practicable" under the particular circumstances of the state involved. Measured by this test the Massachusetts Congressional Apportionment Act does not pass constitutional muster. The reason for this is that there is nothing whatsoever before us to show that it would not have been entirely "practicable" for the legislature to have districted the Commonwealth not as it did, but as recommended by either the majority or minority of its joint special committee which, had it done so, would have provided districts more nearly equal in population as the above table clearly shows. This in a nut shell disposes of the case at bar. But we would be less than frank if we ended our opinion at this point.

First and foremost we wish clearly to emphasize that we do not intend to imply, far less to hold, that apportionment according to either committee report would meet the federal constitutional standard.

For all that has been made to appear it would be entirely "practicable" to divide the Commonwealth into even more nearly numerically equal districts. Moreover, it is evident from the joint special committee's reports that, lacking the guidance of Wesberry v. Sanders, neither the majority nor the minority confined its consideration to population but gave weight to constitutionally extraneous matters such as area.

In the second place we think discussion of the proper use of other cases as precedents is in order.

 While staying within mathematical limits judicially approved in comparable congressional districting cases is not necessarily to stay within constitutional bounds for the reason, as we have already pointed out, that apportionment cases are not to be decided by application of any mathematical formula but must be solved by the test of practicability with reference to the specific situation present in the state involved,[3] nevertheless deviations from the ideal quotient judicially disapproved in other cases do give some indication of the limits of constitutional departure from numerical equality. This invites discussion of Grills v. Branigan, 255 F.Supp. 155 (S.D.Ind.1966), heavily relied upon by the defendants.

In that case a majority of a three-judge district court for the Southern District of Indiana held constitutionally acceptable the Indiana Congressional Reapportionment Act of 1965 in a factual context rather strikingly similar to the present.[4] Specifically the court held that an extreme variation in the population of congressional districts from 369,663 to 454,208, or 84,545, or from an under population of 12.8% to an over popula-

3. See Reynolds v. Sims, supra, 377 U.S. 578, 84 S.Ct. 1390, wherein the Court said: "What is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case." See also Swann v. Adams, infra, in which the Court said: "* * * the fact that a 10% or 15% variation from the norm is approved in one State has little bearing on the validity of a similar variation in another State."

4. The majority of the court in doing so said it was "not unmindful" of the likelihood of improvements by subsequent legislation and "strongly suggested" that the General Assembly of Indiana take action to eliminate "any abnormalities in the 1965 congressional reapportionment Act."

tion of 7.2% for a total variance from the least to the highest populated district of 20%,[5] did not render the apportionment constitutionally invalid.

But on appeal sub nom. Duddleston v. Grills, 385 U.S. 455, 87 S.Ct. 611, 17 L.Ed.2d 508 the Supreme Court on January 9, 1967, vacated the judgment of the district court and remanded for further consideration in the light of Swann v. Adams, decided on the same day, and also in the light of Wesberry v. Sanders and Reynolds v. Sims, supra. Having already discussed the last two cases we turn to Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501.

Swann v. Adams is a state legislative apportionment case. In it a three-judge district court for the Southern District of Florida held a Florida apportionment constitutionally valid although the senate districts ranged in population from 87,-595 to 114,053 or from 15.09% over represented to 10.56% under represented and the house districts ranged in population from 34,584 to 48,785 or from 18.28% over represented to 15.27% under represented. On appeal the Supreme Court reversed. It said: "We reverse for the failure of the State to present or the District Court to articulate acceptable reasons for the variations among the populations of the various legislative districts with respect to both the senate and house of representatives."

The Court reiterated that mathematical exactness is not required in state apportionment plans. It said at page 444, 87 S.Ct. at page 572: *"De minimis* deviations are unavoidable, but variations of 30% among senate districts and 40% among house districts can hardly be deemed *de minimis* and none of our cases suggests that differences of this magnitude will be approved without a satisfactory explanation grounded on acceptable state policy." Defining "acceptable state

policy" sufficient to justify deviations from a strict population basis for apportionment, the Court, referring to Reynolds v. Sims, 377 U.S. at page 579, 84 S.Ct. 1362 said: " * * * variations from a pure population standard might be justified by such state policy considerations as the integrity of political subdivisions, the maintenance of compactness and contiguity in legislative districts or the recognition of natural or historical boundary lines." The Court declared that it had no alternative but to reverse because "no attempt had been made to explain or justify the many variations among the legislative districts."

Since the Court vacated the judgment in Duddleston v. Grills and remanded for reconsideration in part on Swann v. Adams and Reynolds v. Sims, both state legislative apportionment cases, there can be no doubt that the principles enunciated in those cases apply also in congressional apportionment cases like *Duddleston* and the case at bar.

■ We have discussed the opinion in Swann v. Adams in some detail and quoted from it at some length not merely because it is the last authoritative word on the subject but more importantly because, as the dissenting justices point out, it announces a departure from past practice in that it casts the burden on the state of explaining or justifying whatever departures there may be, within of course constitutionally imposed limits, from a strict population basis for districting. That is to say, states now must be prepared to show a valid reason for any departure, beyond *de minimis,* from districting strictly on the basis of population.

■■ We shall not now grant any injunctive relief. Instead, since the Massachusetts Legislature is now in session and the next congressional election is almost two years distant, and since "legis-

5. None of the districts varied from the ideal population figure (423,863) by as much as 15% and only one by more than 10%.

lative reapportionment is primarily a matter for legislative consideration and determination, and \* \* \* judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so", Reynolds v. Sims, supra, 377 U.S. 586, 84 S.Ct. 394, quoted with approval in Burns v. Richardson, 384 U.S. 73, 85, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), we shall, in accordance with the general practice in these cases, retain our jurisdiction pending appropriate action by the Massachusetts Legislature.

### INTERLOCUTORY DECLARATORY DECREE

This action came on for hearing before the Court, Woodbury, Senior Circuit Judge, and Wyzanski and Garrity, District Judges, and the issues having been duly heard on cross motions for summary judgment and a decision having been duly rendered,

It is Declared

that Chapter 57, section 1, of the General Laws of the Commonwealth of Massachusetts, as amended by Acts of 1962, Chapter 315, violates Art. I, § 2, of the Constitution of the United States and is invalid.

The court will withhold further action until after the end of the current session of the Massachusetts Legislature. Jurisdiction over the parties is retained until further order of the court.

Dated at Boston, Massachusetts, this 15th day of February, 1967.

/s/ Russell H. Peck
Clerk of Court

PETER WOODBURY
Senior Circuit Judge

CHARLES E. WYZANSKI, JR.
United States District Judge

W. ARTHUR GARRITY, JR.
United States District Judge