OPINIONS OF THE JUSTICES TO THE GOVERNOR.

*Elections.  Words, "In the district."*

Upon the creation of a vacancy in the Ninety-second Congress of
the United States by reason of the expected resignation of the
representative from the Fifth Congressional District of Massachu-
setts, the precepts to be issued under G. L. c. 54, § 140, to every
city and town "in the district," directing the calling of a special
election to fill the vacancy, should be sent to the cities and towns
comprising the Fifth Congressional District as in effect under
St. 1967, c. 472, § 1, on November 3, 1970, the date of the general
election for the Ninety-second Congress [897–900, 902–903]; St. 1971,
c. 1074, rearranging Congressional Districts, and transferring out of
the Fifth Congressional District one city and three towns and trans-
ferring into it seven towns, was designed to establish districts for
electing representatives to the Ninety-third Congress and subse-
quent Congresses, not to fill vacancies in the Ninety-second Con-
gress, notwithstanding the provision of § 2 of c. 1074, that the
act should "take effect upon its passage" [900–902].  TAURO, C.J.,
dissenting.

On April 24, 1972, the Justices submitted the follow-
ing answers to a question propounded to them by the
Governor.

To His Excellency, the Governor of the Common-
wealth:

The undersigned Justices of the Supreme Judicial
Court respectfully submit this answer to the question set
forth in a request dated April 3, 1972, and submitted to
us on April 4, 1972.

Your request indicates that the representative from
the Fifth Congressional District of Massachusetts to the
Ninety-second Congress of the United States will soon
resign, thereby creating a vacancy in the Common-
wealth's representation in Congress.  At the time of the
last general election on November 3, 1970, G. L. c. 57,
§ 1, as appearing in St. 1967, c. 472, § 1, provided that
the Fifth Congressional District was to consist of the
cities of Lawrence, Lowell, and Woburn and the towns

of Andover, Bedford, Billerica, Burlington, Carlisle,
Chelmsford, Dracut, Dunstable, Groton, Lexington,
Methuen, North Reading, Pepperell, Reading, Tewks-
bury, Tyngsborough, Wakefield and Wilmington. By
St. 1971, c. 1074, § 1, amending G. L. c. 57, § 1, the
boundaries of the Fifth Congressional District were
changed in the following manner: The city of Woburn
and the towns of Burlington, Reading, and Wakefield
were transferred from the district, and the towns of
Acton, Ashby, Boxborough, Concord, Littleton, Town-
send, and Westford were transferred into the district.
Chapter 1074, § 2, provided that the act should "take
effect upon its passage."

In view of the change in district boundaries, you request
our opinion as to "which version of G. L. c. 57, § 1, would
govern for purposes of identifying the cities and towns
to which precepts [for a special election] would be issued
under G. L. c. 54, § 140."

General Laws c. 54, § 140, is the statute clearly in-
tended to apply in the event of a vacancy. It reads as
follows: "Upon failure to choose a representative in con-
gress or upon a vacancy in said office, the governor shall
cause precepts to be issued to the aldermen in every city
and the selectmen in every town *in the district,* directing
them to call an election on the day appointed therein for
the election of such representative" (emphasis supplied).
The General Court may enact such a statute. See art. 1,
§ 2, first and fourth pars. and § 4, first par. of the Con-
stitution of the United States; 2 U. S. C. §§ 1–9, esp. § 8
(1970).

· The issue is the meaning of the words "in the district"
in G. L. c. 54, § 140. The current phraseology dates from
St. 1898, c. 548, § 272. The Legislature then combined
two paragraphs in the election act of 1893 which dealt
separately with failure to elect a representative and a
vacancy in that office. See St. 1893, c. 417, § 216. The
second paragraph of § 216 governing the filling of a va-
cancy provided: "If a *vacancy* occurs in the office of
representative in congress, the governor shall . . . cause

precepts to be issued for an election of representative in congress *in the district in which the vacancy occurs*" (emphasis supplied). By comparison, the first paragraph of § 216 provided: "If there is a *failure at an election to choose a representative* in congress in a congressional district, the governor shall cause precepts to be issued to the board of aldermen in every city and the selectmen in every town *in the district*" (emphasis supplied). Earlier statutes, the first enacted in 1833, likewise treated failures to elect and vacancies in office separately and contained language similar to that in the 1893 act. See St. 1833, c. 68, §§ 4, 5; Rev. Sts. c. 6, §§ 6, 7; Gen. Sts. c. 9, §§ 5, 6; Pub. Sts. c. 9, §§ 5, 6; St. 1890, c. 423, §§ 167, 168.

We are of opinion that, when the Legislature by St. 1898, c. 548, § 272, combined the separate provisions just cited, there was no intention to change the preëxisting law. The 1898 act was entitled, "An Act to revise and codify the laws relative to elections." The general rule is that "verbal changes in the revision of a statute do not alter its meaning and are construed as a continuation of pre-existing law in the absence of some accompanying report of revisers or other indication showing an express purpose to change the substance of the law." *Derinza's Case*, 229 Mass. 435, 442–443. See *Longyear* v. *Commissioner of Corps. & Taxn.* 265 Mass. 585, 588; *Neiss* v. *Burwen*, 287 Mass. 82, 95–96. There is nothing to indicate that a change in substance was intended. Instead, it appears that the change was made purely to consolidate two provisions redundant in some respects. We conclude, therefore, that G. L. c. 54, § 140, as applicable to congressional vacancies, continues the import of earlier statutes, and that an election to fill a vacancy in the House of Representatives should be conducted in the district in which the vacancy exists.

The incumbent representative was elected by the people of the Fifth Congressional District as that district existed on November 3, 1970. In these circumstances, we are of opinion that, notwithstanding any change in dis-

trict boundaries made subsequent to his election, he con-
tinues to represent the people of the cities and towns
which chose him.   In *Reynolds* v. *Sims,* 377 U. S. 533,
562, the Supreme Court of the United States said: "Leg-
islators represent people . . . .   Legislators are elected
by voters."   Cf. *Wesberry* v. *Sanders,* 376 U. S. 1, 7–9.
These cases indicate that a legislator represents the con-
stituency which elected him.   Since the incumbent was
elected to the Ninety-second Congress to represent a par-
ticular constituency, in the normal course of events he
would serve that constituency for the duration of that
Congress.   We are of opinion, therefore, that, if the
incumbent does not serve his full term but ceases to serve
during his term, the resulting vacancy in the Ninety-
second Congress will then occur in the district from which
he was elected to office.

As we interpret St. 1971, c. 1074, § 1, in so far as it
applies to elections of representatives in Congress, the
statute was intended to establish districts for electing
representatives to the Ninety-third Congress and subse-
quent Congresses.   It was not designed for the purpose
of filling vacancies in the Ninety-second Congress.   Two
factors lead us to this view.

First, ordinarily "statutes do not govern situations not
within the reason of their enactment and giving rise to
radically diverse circumstances presumably not within
the dominating purpose of those who framed and enacted
them."   *Commonwealth* v. *Welosky,* 276 Mass. 398, 403,
cert. den. 284 U. S. 684.   *Edgar H. Wood Associates, Inc.*
v. *Skene,* 347 Mass. 351, 362.   As is commonly known,
the reason for enacting St. 1971, c. 1074, was to redis-
trict the Commonwealth for the next regular congres-
sional election in accordance with the "one person, one
vote" principle.   See *Wesberry* v. *Sanders,* 376 U. S. 1,
7–18, applying *Gray* v. *Sanders,* 372 U. S. 368, 381, to
congressional districting.   See also *Dinis* v. *Volpe,* 264
F. Supp. 425, 428 (D. Mass.).   There is nothing to indi-
cate an intention that the apportionment scheme is to
apply to a special election held to fill the uncompleted

term of a representative elected to the present Congress.

Second, a statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts about it upon that score. *Loriol* v. *Keene*, 343 Mass. 358, 363. If St. 1971, c. 1074, were to be interpreted as applicable, a serious constitutional question might arise. The apportionment cases of the Supreme Court indicate that the right to vote includes the right not to have that vote diluted. See *Wesberry* v. *Sanders*, 376 U. S. 1, 7–9; *Reynolds* v. *Sims*, 377 U. S. 533, 555. If the proposed special election were to be held in the new Fifth Congressional District (G. L. c. 57, § 1, as appearing in St. 1971, c. 1074, § 1) the voters of Woburn, Burlington, Reading, and Wakefield would be denied a voice in the replacement of their representative in the present Congress. By the same token, the voters of Acton, Ashby, Boxborough, Concord, Littleton, Townsend, and Westford would be allowed to participate in the selection of a successor to a representative whom they did not elect in the first place. Such a result might be thought to dilute the votes cast in the last general election by the residents of the four municipalities which the 1971 act removes from the old Fifth Congressional District. If the 1971 act contracts the value of the votes cast by some citizens, it at the same time expands the value of those cast by other citizens. It is at least doubtful, in view of *Wesberry* v. *Sanders*, 376 U. S. 1, whether a State may enforce an apportionment scheme which produces these results. Furthermore, if the eighteenth (1960) decennial census remains the governing census for apportionment purposes until the election of the Ninety-third Congress (as may well be the case under 2 U. S. C. § 2a [1970]), then a special interim election conducted in a district set out in the 1971 act might also be subject to attack on the ground that the new statute is based on the nineteenth (1970) decennial census which is not as yet applicable. Cf. *Ex parte Siebold*, 100 U. S. 371, 383–384.

The problem would become particularly acute if, for a

subsequent election, the number of representatives allotted to the Commonwealth were to be reduced. Such a situation arose in 1962 (see e.g. St. 1962, c. 315, § 1), when it would have been difficult, if not impossible, to employ the new districts in filling a vacancy.

The question has arisen in three other States. In *Sloan* v. *Donoghue*, 20 Cal. 2d 607, the California court held that, notwithstanding redistricting by the State Legislature since the last regular congressional election, (a) the new district boundaries would not apply until the next regular congressional election and (b) a special election called in the interim should be held under the old district boundaries. In similar cases, the courts of Arkansas and New York reached a different conclusion, although in the New York case there were two dissenting opinions. See *Catlett* v. *Beeson*, 240 Ark. 646; *People ex rel. Fitzgerald* v. *Voorhis*, 222 N. Y. 494. We adopt, as the more reasonable view, that taken by the Supreme Court of California and the dissenting Judges of the Court of Appeals of New York.

It was observed by the California court (20 Cal. 2d 607, 610) that the House of Representatives, acting under art. 1, § 5, first par. of the Constitution of the United States, refused a seat to a person elected in a special election, when the result would be dual representation of some voters and the disenfranchisement of others. The House of Representatives said in *Hunt* v. *Menard*, 2 Bartlett, Contested Elections in Congress, 477, 483 (quoting and adopting the minority report in *Perkins* v. *Morrison*, 1 Bartlett, *id.* 142, 147): "It would not be a preservation of the purity of the elective franchise, nor would it be a just guardianship of the republican principle, that all [shall] have a right to be represented, to admit the power of a State legislature to provide that a portion of the people should have two representatives in Congress, while another portion should have none, or not be represented by the man of their choice."

The Justices answer as follows: For the purpose of identifying the cities and towns to which precepts should

be issued under G. L. c. 54, § 140, the applicable boundaries are those of the Fifth Congressional District as in effect on November 3, 1970.

> R. AMMI CUTTER.
> JACOB J. SPIEGEL.
> PAUL C. REARDON.
> FRANCIS J. QUIRICO.
> ROBERT BRAUCHER.
> EDWARD F. HENNESSEY.

I am unable to agree with the opinion rendered by my fellow Justices. I, therefore, submit this separate answer to the question you have posed to the Justices of the Supreme Judicial Court.

Your request states that you are in doubt as to the lawful manner in which to execute your statutory duty, "upon a vacancy in . . . [the] office . . . [of representative in Congress, to] cause precepts to be issued" to election officials in the cities and towns of the district for the calling of a special election to fill the vacancy. G. L. c. 54, § 140. See United States Constitution, art. 1, § 2, fourth paragraph.

According to your request, the doubt arises in the following circumstances: "[T]he present incumbent in [the Ninety-second Congress from] the Fifth Congressional District will soon resign, thereby creating a vacancy in that office. . . . At the time of the incumbent's election in 1970, the cities and towns in the Fifth Congressional District were enumerated in G. L. c. 57, § 1, as appearing in St. 1967, c. 472, [§ 1]. Since then, however, G. L. c. 57, § 1, was amended by St. 1971, c. 1074, [§ 1,] which added the towns of Acton, Ashby, Boxborough, Concord, Littleton, Townsend and Westford to the Fifth Congressional District, and transferred the city of Woburn and the towns of Burlington, Reading and Wakefield to other districts. Chapter 1074 was approved November 12, 1971, and contained, in Section 2, a provision that it . . . take effect upon its passage."

It is the opinion of the majority of the Justices that

you should cause precepts to be issued to election officials in the cities and towns of the old Fifth Congressional District. I cannot join with them because, in my view, their advice, if followed, might well involve you in an unconstitutional action. I am of opinion that, because St. 1971, c. 1074, abolished the old Fifth Congressional District, the only district which exists in law is the new Fifth Congressional District. Under the Federal Constitution, an election must be conducted in the manner which the General Court has prescribed by law. Art. 1, § 4, first paragraph. See 2 U. S. C. §§ 2c, 8 (1970). To hold the anticipated special election in the old district, which has no legal existence, therefore would be to violate the express command of the Federal Constitution. And further, such action could infringe upon the prerogatives of the General Court whose duty alone it is to make the laws of this Commonwealth. Massachusetts Constitution, Declaration of Rights, art. 30.

We, the Justices, must not, in advising Your Excellency, substitute our individual, personal judgments for the judgment of the Legislature. As it is your duty faithfully to carry out the legislative mandate, it is ours correctly to interpret the legislative mandate in accordance with its plain meaning.

The issue presented is the proper construction of the new apportionment statute. St. 1971, c. 1074. The statutory language, which the majority purport to interpret but never quote, is plain and unambiguous. General Laws c. 57, § 1, as appearing in § 1 of c. 1074 provides: "For the purpose of electing representatives in the Congress of the United States . . . the commonwealth is divided into . . . twelve districts." Section 2 of the statute provides: *"This act shall take effect upon its passage"* (emphasis supplied). We have said: "[I]f the words in the statute are clear and explicit, there is no room for speculation." *Corcoran* v. *S. S. Kresge Co.* 313 Mass. 299, 303.[1] See *Chouinard, petitioner*, 358

---

[1] The case cited by the majority, *Commonwealth* v. *Welosky*, 276

Mass. 780, 782; Sutherland, Statutory Construction (3d ed. Horack) § 4702.

It would be difficult to find statutory language which admits so little of elaborate construction. My fellow Justices reject the unequivocal meaning of the statutory language, apparently, because they believe the Legislature could not have intended what they regard, upon wholly abstract grounds, as an unreasonable application of the statute. They would therefore interpolate words into the statute to the effect that the provisions governing the election of representatives apply only to elections "to the [next] Ninety-third Congress and subsequent Congresses" and not to interim elections to the present Ninety-second Congress. I do not agree. The clear and explicit words of the statute, not the Justices' notion of what is an unreasonable application, are the proper guide in ascertaining the intention of the Legislature. Otherwise, we would, in effect, be telling the Legislature: "We understand what you say, but we do not believe you mean what you say."

Special elections to fill legislative vacancies are reasonably foreseeable occurrences, and there is no basis for supposing that the General Court in 1971 was unaware of this fact of life. Indeed, where, as here, the apportionment statute was framed in general terms with specific language that it take effect upon passage, the natural presumption would be that the Legislature meant to cover elections to fill vacancies in the Ninety-second Congress as well as elections to choose representatives for subsequent Congresses. If the intent had been otherwise, the Legislature would have explicitly excluded interim elections from the scope of the act and it would have omitted the provision making it effective on passage. To rule now, therefore, that the statute does not apply to a special election to the Ninety-second Congress is both to

---

Mass. 398, 403, is inapposite because the statutory language interpreted in that case, unlike the language involved here, was ambiguous and not free from doubt as to the Legislature's intent. *Id.* at 406.

contradict the plain language of the statute and to frustrate the probable intention of the Legislature.

It is of course true, as the majority state, that the Justices must construe a statute, *"if fairly possible,* so as to avoid not only the conclusion that it is unconstitutional but also grave doubts . . . [on] that score. *Loriol* v. *Keene,* 343 Mass. 358, 363" (emphasis supplied). See Sutherland, Statutory Construction (3d ed. Horack) § 5904. What my fellow Justices have done, however, is to ignore the express restriction in the cited rule. The construction which they urge is not *"fairly possible"* because its effect is to nullify the intention of the Legislature as evidenced by the clear and unambiguous language of its enactment. I agree with the Supreme Court of the United States which has said: " 'Although this Court will often strain to construe legislation so as to save it against constitutional attack, *it must not and will not carry this to the point of perverting the purpose of a statute . . .'* or *judicially rewriting it"* (emphasis supplied). *Aptheker* v. *Secretary of State,* 378 U. S. 500, 515. See *Welsh* v. *United States,* 398 U. S. 333, 354–355 (concurring opinion by Harlan, J.). Cf. *Mobil Oil Corp.* v. *Attorney Gen., ante,* 401, 419 (dissenting opinion by Hennessey, J.).

I believe that St. 1971, c. 1074, can be constitutionally applied. The two grounds advanced by my fellow Justices for denying it application are not persuasive. First, it is urged that the 1960 Federal census applies for purposes of congressional districting until the next regular congressional election on November 7, 1972. Yet properly understood, the apportionment cases of the Supreme Court do not require a particular census as the measure of the "one person, one vote" principle (*Gray* v. *Sanders,* 372 U. S. 368, 381). The standard is population and any accurate calculation of population may be used. See *Kirkpatrick* v. *Preisler,* 394 U. S. 526, 535.[2] I doubt very

---

[2] In the *Preisler* case, it was stated: "[A] congressional districting plan will usually be in effect for at least 10 years and five congres-

much, therefore, that Federal intercession would be warranted if the special election is called in the new Fifth Congressional District merely because the new district reflects population as determined by the most recent (1970) Federal census.[3]

I am no more persuaded by the second theory which the majority advance. The danger of dual representation of some citizens and the disenfranchisement of others is, in my view, a purely conjectural fear which does not merit the attention of a constitutional court. The Supreme Court of Arkansas succinctly answered this contention as follows: "[It is without merit] because said electors are now living in other congressional districts and are free to exercise the right of voting therein when the occasion arises." *Catlett* v. *Beeson*, 240 Ark. 646, 648. My fellow Justices assert that "a legislator represents the constituency which elected him" and, consequently, his district cannot be changed during his term of office.[4] There

---

sional elections. Situations may arise where substantial population shifts over such a period can be anticipated. Where these shifts can be predicted with a high degree of accuracy, States that are redistricting may properly consider them." See *Bush* v. *Martin*, 251 F. Supp. 484, 517, n. 107 (S. D. Texas).

[3] It is interesting to note in this connection that Federal District Courts have made use of population data other than the 1960 Federal census in their determination of the propriety of congressional districting plans. In *Meeks* v. *Avery*, 251 F. Supp. 245, 250 (D. Kans.), the court found the "record . . . completely devoid of any indication that the choice of the 1964 state enumeration figures over the 1960 federal census figures as the basis for determination of population was anything more than the exercise of judgment in the legislative process." The court further stated (at 249–250): "References in Article I, Sections 2 and 4 [of the Constitution], in Section 2 of the Fourteenth Amendment to the Constitution, and in 2 U.S.C.A. § 2a, to the enumeration of the population of the various states have to do with the apportionment of representatives *among* the states, not within them." In *Exon* v. *Tiemann*, 279 F. Supp. 609 (D. Neb.), the court, using as its guideline a 1966 estimate of population and a 1967 projection of population, found the congressional districts drawn by the Legislature to be proper. See *Gong* v. *Kirk*, 278 F. Supp. 133 (S. D. Fla.), affd. sub nom. *Kirk* v. *Gong*, 389 U. S. 574.

[4] It might appear that you are also of this view, for in your request it is stated: "It would appear from the language of St. 1971, c. 1074, that it is now in effect and that any Congressional election held for the Fifth Congressional District at this time must be held in the district as constituted in that act. This would mean, however, that any congressman now elected would be elected by and represent seven

is, however, no judicial decision which supports this proposition. On its facts, *Wesberry* v. *Sanders*, 376 U. S. 1, 7–9, cited for the proposition, involved the question whether the Constitution requires substantial equality of population in electoral districts for the House of Representatives. *Reynolds* v. *Sims*, 377 U. S. 533, 562, also relied upon, considered the same issue as applied to State Legislatures. Neither case, as far as I can tell, enunciated a theory of representation, expressly or otherwise.

Reliance is also placed upon *Hunt* v. *Menard*, a decision of the House of Representatives in a contested congressional election case. See 2 Bartlett, Contested Elections in Congress, 477, 483. It should be noted, however, that an earlier decision is contra. *Perkins* v. *Morrison*, as reported in 1 Bartlett, *id.*, 142. In any event, the present House of Representatives is not bound to follow the decisions of predecessor bodies nor do such decisions serve as binding precedents upon courts of law. Under art. 1, § 5, first paragraph, of the Federal Constitution, the House of Representatives is the sole judge "of the elections, returns and qualifications of its own members." We should not seek to anticipate the action of the present House which, as likely as not, might be based on purely political grounds. See *People ex rel. Fitzgerald* v. *Voorhis*, 222 N. Y. 494, 499.

Wholly apart from abstract considerations, it seems to me that, as a practical matter, a new pattern of congressional representation has been in effect by virtue of St. 1971, c. 1074, since its approval on November 12, 1971. This is true because political history demonstrates that the present Congressmen, although elected from the old districts established under G. L. c. 57, § 1, as appearing in St. 1967, c. 472, § 1, will heed the complaints and advice of the people of the new districts where they must stand for reëlection. The only conclusion based on actual

towns already represented in Congress by representatives elected in 1970, and that one city and three towns would be left with no Congressional representative at all." From my opinion *infra*, it is clear that I regard this proposition as without legal or historical support.

practice, therefore, is that the incumbent representative who will soon resign represents the citizens of the new Fifth Congressional District and not the citizens of the old district. Furthermore, since the record of congressional elections is that an incumbent, even a first-term congressman, has a distinct advantage over his opponent,[5] it is naive to suppose that all that is at stake here is the mere filling of a vacancy in the present Ninety-second Congress. The likelihood is that the person elected in the anticipated special election will be reëlected in the general election this fall and also in subsequent elections. The voters with the legitimate interest in the special election are therefore the voters of the new district. A contrary view would deprive the citizens of the communities newly added to the Fifth Congressional District of the

---

[5] The following statistics, appearing in C. O. Jones, Every Second Year, 68–70, show that a high percentage of incumbent representatives continually win reëlection. Since 1955, the average term of a Congressman has exceeded five terms.

*Number and Percentage of Incumbents*
*Who Won Reelection, 1956–66*

| Year | Total incumbents seeking reelection | Those who lost the primary | | Those who lost the general election | | Those who were reelected | |
|------|------|------|------|------|------|------|------|
| 1956 | 411 | 6 | 1.5% | 16 | 3.9% | 389 | 94.6% |
| 1958 | 394 | 3 | 0.8 | 37 | 9.4 | 354 | 89.8 |
| 1960 | 403 | 5 | 1.2 | 26 | 6.5 | 372 | 92.3 |
| 1962 | 393 | 11 | 2.8 | 14 | 3.6 | 368 | 93.6 |
| 1964 | 397 | 8 | 2.0 | 44 | 11.1 | 345 | 86.9 |
| 1966 | 407 | 5 | 1.2 | 40 | 9.8 | 362 | 89.0 |

*Percentage of Freshmen Who Won Reelection, 1956–66*

| Year | Total freshmen seeking reelection | Those who lost the primary | | Those who lost the general election | | Those who were reelected | |
|------|------|------|------|------|------|------|------|
| 1956 | 48 | 1 | 2.1% | 6 | 12.5% | 41 | 85.4% |
| 1958 | 38 | 0 | | 7 | 18.4 | 31 | 81.6 |
| 1960 | 74 | 0 | | 15 | 20.3 | 59 | 79.7 |
| 1962 | 52 | 2 | 3.8 | 3 | 5.8 | 47 | 90.4 |
| 1964 | 61 | 1 | 1.6 | 10 | 16.4 | 50 | 82.0 |
| 1966 | 79 | 0 | | 25 | 31.6 | 54 | 68.4 |

opportunity to choose the person who, in all probability, will represent them in Congress for many years to come. In interpreting the Federal Constitution, we should not be blind to these realities.

For the reasons given, I conclude that the special election to fill the vacancy of the incumbent representative should be called in the cities and towns of the new Fifth Congressional District.

Even assuming, arguendo, however, that the new apportionment statute cannot constitutionally apply to the interim election, I would advise against the issuance of precepts to the cities and towns of the old district. As I have indicated, *supra*, my view is that the Federal Constitution precludes the holding of an election in a district which does not exist in State law. There can be no doubt that St. 1971, c. 1074, abolished the old districts, including the Fifth Congressional District as it formerly existed in November, 1970.[6] It is illogical to contend that the constitutional requirement that congressional elections be held in the manner prescribed by State law (United States Constitution, art. 1, § 4, first paragraph) will be met if the boundaries of an abolished, and hence nonexistent, district are used. As the Court of Appeals of New York said in an analogous situation, "That which is prescribed by law means that which is prescribed by an existing law and not by a law which has ceased to exist." *People ex rel. Fitzgerald* v. *Voorhis*, 222 N. Y. 494, 500. In light of the foregoing discussion, if your decision is that the special election should be held in the

---

[6] Section 1 amended G. L. c. 57 (Districts) "by striking out section 1, as most recently amended . . . and inserting in place thereof . . . [a new § 1]" establishing boundaries for each of the Commonwealth's twelve congressional districts. "[A]n amendatory act which purports to set out in full all that it intends to contain, operates as a repeal of anything omitted which was contained in the old act and not included in the amendatory act." Crawford, Statutory Construction, § 305. See *United States* v. *Baker*, 189 F. Supp. 796, 802 (W. D. Pa.), affd. 293 F. 2d 613 (3d Cir.), cert. den. sub nom. *Baker* v. *United States*, 368 U. S. 914; Sutherland, Statutory Construction (3d ed. Horack), § 1932. Cf. *Wilson* v. *Head*, 184 Mass. 515, 516–517; *McKenney* v. *McNearney*, 92 Idaho, 1, 4.

old district, you would be well advised to consider obtaining a legislative enactment exempting the special election from the provisions of G. L. c. 57, § 1, as appearing in St. 1971, c. 1074, § 1.[7]

In any event, my answer to your question is as follows: Your duty under G. L. c. 54, § 140, is to cause precepts to be issued for the calling of a special election in the Fifth Congressional District established by G. L. c. 57, § 1, as appearing in St. 1971, c. 1074, § 1.

G. JOSEPH TAURO

---

[7] Any suggestion that G. L. c. 54, § 140, accomplishes this purpose is in error. "Statutes . . . which relate to the same matter . . . in the event one of them is ambiguous or uncertain, are to be construed together." Crawford, Statutory Construction, § 231. See *Everett* v. *Revere*, 344 Mass. 585, 589; *Goldsmith* v. *Reliance Ins. Co.* 353 Mass. 99, 102. Also, the General Laws are presumed to have been intended to be consistent. *Goodale* v. *County Commrs. of Worcester*, 277 Mass. 144, 151. Thus, even if the majority are correct in believing the words "in the district" in G. L. c. 54, § 140, require interpretation, the proper source to clarify this ambiguity is G. L. c. 57, § 1, as appearing in St. 1971, c. 1074, § 1, because this is the congressional districting statute in Massachusetts. As applied to the instant facts, "district" in G. L. c. 54, § 140, therefore, can only mean the Fifth Congressional District as delineated in the 1971 statute.